1  John P. Pringle, SBN 072300
   Toan B. Chung, SBN 276505
2  **ROQUEMORE, PRINGLE & MOORE, INC.**
   6055 E. Washington Blvd., Suite 500
3  Los Angeles, CA  90040-2466
4  Tel No. (323) 724-3117
   Fax No. (323) 724-5410
5  tbchung@rpmlaw.com

6  Attorneys for Charles W. Daff,
   Chapter 7 Trustee
7

8

9               **UNITED STATES BANKRUPTCY COURT**

10       **CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION**

11
   In re                              Case No. 6:16-bk-17768-MH
12
   DISPATCH TRANSPORTATION LLC,       Chapter 7
13
                        Debtor.       **CHAPTER 7 TRUSTEE'S NOTICE OF**
14                                     **MOTION AND MOTION FOR ORDER**
                                       **APPROVING SALE OF ESTATE**
15                                     **PROPERTY SUBJECT TO OVERBID**
                                       **PURSUANT TO 11 U.S.C. § 363;**
16                                     **MEMORANDUM OF POINTS AND**
                                       **AUTHORITIES; DECLARATIONS IN**
17                                     **SUPPORT THEREOF**

18                                     Date:      July 31st, 2017
                                       Time:      12:00 p.m.
19                                     Place:     U.S. Bankruptcy Court
                                                  Courtroom 303
20                                                3420 Twelfth Street
21                                                Riverside, CA 92501

22  **TO THE HONORABLE MARK D. HOULE, UNITED STATES BANKRUPTCY JUDGE,**

23  **THE DEBTOR, AND OTHER PARTIES IN INTEREST:**

24
        **PLEASE  TAKE  NOTICE** that Charles W. Daff, the duly appointed and acting Chapter
25
26  7 Trustee (the "Trustee") of the bankruptcy estate (the "Estate") of the above-captioned debtor

27  Dispatch Transportation LLC (the "Debtor") in Case No. 6:16-bk-17768-MH (the "Bankruptcy

28  Case"), will move (the "Motion"), at the date, time, and courtroom stated above (the "Sale

Hearing"), for an Order Approving Sale of Estate Property Subject to Overbids Pursuant to 11 U.S.C. § 363.

**PLEASE TAKE FURTHER NOTICE** that the Motion pertains to the sale (the "Sale") of the Estate's interest in the Assets as defined in the attached Asset Purchase Agreement to Commodity Trucking Acquisition, LLC ("CTA" or the "Purchaser"), for $150,000.00 (the "Sale Proceeds"), on an "as is, where is" basis, without any warranties, either express or implied. The basis of the Motion is that the Estate's interest in the Claims is property of the Estate and the sale of said interest would maximize the value of the Estate and is therefore in the best interest of the Estate and its creditors. The Motion is based on the attached notice of the Motion, the attached Memorandum of Points and Authorities, the attached declaration, the attached exhibits and the pleadings on file in the Debtor's bankruptcy case and the arguments of the Trustee or his Counsel at the time of the hearing. The Motion is made pursuant to all authorities cited herein.

**PLEASE TAKE FURTHER NOTICE** that the Sale is subject to overbid. As set forth in the proposed bidding procedures, overbids shall be in increments of $1,000.00. The overbidder must tender a Bid Deposit of $4,500.00 in the form of certified funds to the Trustee's counsel on or before July 28, 2017 by 4:00 p.m. Pacific Time in order to bid for the Estate's interest in the Assets. If the overbidder is the winning bidder at the Sale Hearing, the Bid Deposit of said overbidder shall be non-refundable. The Motion further requests that the Trustee be authorized to execute all documents necessary to consummate the Sale.

**PLEASE TAKE FURTHER NOTICE** that the Trustee has complied with Loc. Bankr. R. 6004-2. A true and correct copy of Form 6004-2 which has been posted at the Clerk's Office is incorporated therein and attached hereto as **Exhibit "6"**.

**PLEASE TAKE FURTHER NOTICE** that Loc. Bankr. Rule 9013-1(f) requires any response to the Motion to be in writing, filed with the Clerk of the United States Bankruptcy Court

1    (the "Clerk's Office"), and served upon the Trustee's counsel, whose address appears in the upper

2    left corner of the first page of this Notice of Motion, no later than fourteen (14) days prior to the

3    above-scheduled hearing date.  Pursuant to Loc. Bankr. R. 9013-1(h), failure to timely file and

4    serve a responsive pleading may be deemed to constitute consent to the instant request herein.

5    Copies of all pleadings in the Debtor's Bankruptcy Case may be obtained from the Clerk's Office.

6

7

8                                                  Respectfully submitted,

9

10   DATED: July 6, 2017                  **ROQUEMORE, PRINGLE & MOORE, INC.**

11

12                                        By:_____
                                             John P. Pringle, Esq.
13                                           Toan B. Chung, Esq.
                                             Attorneys for Charles W. Daff,
14                                           Chapter 7 Trustee

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.  FACTUAL BACKGROUND

1.      Dispatch Transportation LLC (the "Debtor") filed its Voluntary Petition under Chapter 7 of Title 11 in this case on August 30, 2016 (the "Petition Date").  Charles W. Daff is the duly appointed and acting Chapter 7 Trustee (the "Trustee").

2.      The Debtor's Schedule A/B does not list any assets.  A true and correct copy of the Debtor's Schedule A/B reflecting same is attached hereto and incorporated herein as **Exhibit "1"**.  All of the Debtor's assets were foreclosed (the "Article 9 Foreclosure") prepetition by Comerica Bank ("Comerica") and sold (the "Article 9 Sale") to Commodity Trucking Acquisition, LLC ("CTA" or the "Purchaser") for $12,000,000.00 on September 14, 2011 under Michigan Law pursuant to an Article 9 Purchase Agreement.  A true and correct copy of the Article 9 Purchase Agreement reflecting same is attached hereto and incorporated herein as **Exhibit "2"**.

3.      The Article 9 Foreclosure and the Article 9 Sale were the subjects of a bench trial in that State Court matter entitled <u>Brutoco v. Commodity Trucking Holdings, LLC, et al</u>, Case No. CIVDS1307312 (the "State Court Suit") before the San Bernardino County Superior Court (the "Superior Court").  CTA was a Defendant in the State Court Suit.  On March 20, 2015, the Superior Court issued a Statement of Decision, after a bench trial, finding that both the Article 9 Foreclosure and the Article 9 Sale were "commercially reasonable."  A true and correct copy of the Statement of Decision dated March 20, 2015 reflecting same is attached hereto and incorporated herein as **Exhibit "3"**.

4.      On May 8, 2015, the Superior Court issued a Judgment in favor of the Defendants, including CTA.  A true and correct Judgment dated May 8, 2015 reflecting same is attached hereto and incorporated herein as **Exhibit "4"**.

4.

5.      CTA wishes to purchase the Estate's interest in any and all claims, actions, causes of action, demands, damages, rights, judgments, sums of money, counterclaims, suits, costs, expenses, compensation, debts, dues, accounts, covenants, controversies and liabilities of every kind or nature whatsoever, direct or indirect, known or unknown, that are the property of the Estate and that any of Seller, the Debtor, the Estate and/or any of their respective predecessors, successors, assigns, heirs or affiliates (the "Seller Parties") may have against Purchaser and/or any of its predecessors, successors, heirs, assigns, past and present officers, directors, agents, parents, subsidiaries, affiliates, servants, representatives, employees and attorneys and each of them (collectively referred to as the "Purchaser Parties"), existing as of the Filing, including, without limitation, successor liability, alter ego, fraudulent transfer, and any claims any creditor or any party in interest that could have asserted on its or their own behalf under state law which are general claims with no particularized injury arising from such claims existing as of the Filing (collectively, the "Assets") for $150,000.00, subject to overbid and the Court's approval, pursuant to the terms of the Asset Purchase Agreement attached hereto and incorporated herein as **Exhibit "5"**.

6.      CTA has tendered to the Trustee a bid deposit of $4,500.00 to secure its performance.  The sale shall be on an "as is, where is" basis, without any warranties, either express or implied.

7.      As set forth in the proposed bidding procedures, overbids shall be in increments of $1,000.00.  The overbidder must tender a Bid Deposit of $4,500.00 in the form of certified funds to the Trustee's counsel on or before July 28, 2017 by 4:00 p.m. Pacific Time in order to bid for the Estate's interest in the Assets.  If the overbidder is the winning bidder at the Sale Hearing, the Bid Deposit of said overbidder shall be non-refundable.

8.      The Trustee believes $150,000.00, subject to overbids, is a reasonable offer and

the sale of the Estate's interest in the Claims would maximize the value of the Estate and is therefore in the best interest of the Estate.

9.       The Trustee has complied with Loc. Bankr. R. 6004-2.  A true and correct copy of Form 6004-2 which has been posted at the Clerk's Office is incorporated therein and attached hereto as **Exhibit "6"**.

10.       The sale is advertised through (1) the website of the United States Bankruptcy Court, Central District of California, Sale of Estate Property section; (2) the Twitter account of the United States Bankruptcy Court, Central District of California; and (3) the website of the National Association of Bankruptcy Trustees (the "NABT"), all of which has a nationwide audience.

11.       It is the Trustee's business judgment to propose the sale and he believes that the sale will maximize the value of the Estate.

12.       The Trustee has no affiliation with CTA.  The proposed sale transaction is the product of arm's length, good faith negotiations between the parties and their respective counsel. No consideration is being paid by CTA to the Trustee other than the Sale Proceeds and there is no collusion between the Trustee and CTA.

13.       Trustee requests that CTA be found to be a good faith purchaser pursuant to 11 U.S.C. § 363(m).  The Trustee further requests that he be authorized to execute all documents necessary to consummate the Sale.

## II.  DISCUSSION

**A.       THE COURT SHOULD AUTHORIZE THE SALE BASED UPON THE TRUSTEE'S BUSINESS JUDGMENT.**

Section 363 of the Bankruptcy Code authorizes the Trustee to sell property of the Estate and provides as follows:

"The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."

See 11 U.S.C. § 363(b)(1).

A sale of property owned by a debtor will be allowed under 11 U.S.C. § 363 if the estate has equity in the property and the sale is in the best interest of the estate. Union Bank v. Bloor (In re Investors Funding Corporation of New York), 592 F.2d 134, 135 (2nd Cir. 1979) cert. denied 444 U.S. 830 (1979). Implicit in 11 U.S.C. § 363(b) is the requirement that there be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business. See Committee of Equity Secured Holders v. Lionel Corporation (In re Lionel Corp.), 722 F.2d 1063, 1071 (2nd Cir. 1983). The proposed sale has to be in the best interest of the Estate. Id. at 1071. The business judgment rule allows the Trustee discretion in balancing the costs and the benefits of administering assets of the Estate. See In re Moore, 110 B.R. 924, 928 (Bankr. E.D. Cal. 1998).

The Trustee's application of his or her sound business judgment in the use, sale, or lease of such property is subject to great judicial deference. In re Moore, 110 B.R. 924 (Bankr. C.D. Cal. 1990); In re Canyon Partnership, 55 B.R. 520 (Bankr. S.D. Cal. 1985). In determining whether any sale of assets out of the ordinary course of business should be approved, bankruptcy courts usually consider the following factors:

1.    Whether a sufficient business reason exists for the sale;

2.    Whether the proposed sale is in the best interest of the estate, which in turn consists of the following factors:

   a.    That terms of the sale are fair and reasonable;

   b.    That the proposed sale has been adequately marketed;

   c.    That the proposed sale terms have been properly negotiated and proposed in good faith; and

d.   That the purchaser is involved in an "arms-length" transaction with the seller.

3.   Was notice of the sale sufficient.

See In re Walter, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988) ("there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business . . . As the Second Circuit held in Lionel [In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983)], the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike . . . ").

The proposed sale in this case meets these standards.  The Trustee has concluded that $150,000.00 is an attractive price and that the sale is in the best interest of the Estate and should be approved by the Court as the sale will provide funds from which unsecured creditors may be paid. Based upon the foregoing, the Trustee submits that the proposed sale satisfies the standards for approval of a sale of assets out of the ordinary course of business pursuant to 11 U.S.C. § 363(b). Moreover, it is in the Trustee's business judgment to propose the sale, and he believes that the sale will maximize the value to the Estate.  The Trustee believes that said offer represents the present fair market value of the Estate's interest in the Claims.  If there are any overbids at the time of the hearing, the highest price will represent the fair market value of the Estate's interest in the Claims and the Estate's interest in the Claims should be sold to the highest bidder.  This Court should approve any overbid at the time of the hearing under 11 U.S.C. §363(b).

**B.    THE SALE IS SUBJECT TO OVERBID AT THE TIME OF THE HEARING.**

The proposed sale is subject to overbid at the time of the hearing.  Overbids shall be in increments of $1,000.00.  The overbidder must tender a Bid Deposit of $4,500.00 in the form of certified funds to the Trustee's counsel on or before July 28, 2017 by 4:00 p.m. Pacific Time in order to bid for the Estate's interest in the Assets.  If the overbidder is the winning bidder at the

1    Sale Hearing, the Bid Deposit of said overbidder shall be non-refundable.  The Bankruptcy Court

2    will approve the sale to the highest bidder and a backup bidder at the time of the hearing.  In the

3    event that the sale to the highest bidder fails to be consummated (for any reason), then the Trustee

4    is authorized to sell the property to the back-up bidder.

5

6    **C.**    **THE SALE IS MADE IN GOOD FAITH.**

7    The Motion further requests that CTA or a successful overbidder be found to be a good

8    faith purchaser(s) pursuant to 11 U.S.C. § 363(m).  The good faith requirements under 11 U.S.C.

9    § 363(m) focus primarily on disclosure of all material sale terms and the absence of fraud or

10   collusion.  Cumberland Farms Dairy, Inc. v Abbots Dairy of Pennsylvania, Inc (In re Abbots

11   Dairy of Pennsylvania Inc., 788 F.2d 143, 147 (3rd Cir. 1986).  This relief under 11 U.S.C. §

12   363(m) should be granted as the sale is an arm's length transaction, no consideration is being paid

13   by CTA to the Trustee other than the Sale Proceeds and there is no collusion between the Trustee

14   and CTA.

15

16   **D.**    **ALTERNATIVELY, GOOD CAUSE EXISTS TO APPROVE PURSUANT TO**

17   **FED. R. BANKR. P. 9019.**

18   "On motion by the trustee and after a hearing on notice to creditors, the United States

19   Trustee, the debtor and indentured trustees as provided in Rule 2002 and as such other entities as

20   the court may designate, the court may approve a compromise or settlement." Fed. R. Bankr. P.

21   9019(a).  Approval of a proposed compromise turns on whether the compromise is in "the best

22   interest of the estate."  St. Paul Fire & Marine Insurance Co. v. Vaughn, 779 F.2d 1003, 1010

23   (4th Cir. 1985); In re Continental Investment Corp., 637 F.2d 8, 11 (1st Cir. 1980).

24

25   Approval of a compromise is within the discretion of the court.  U.S. v. Alaska Nat'l

26   Bank of the North (In re Walsh Construction), 669 F.2d 1325, 1328 (9th Cir. 1982).  When a

27   motion to approve compromise is presented to the court, the court must make its independent

28

determination that the settlement is appropriate.   Protective Committee for Independent

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-425 (1968).   In

evaluating the acceptability of a compromise, the court evaluates four factors:

      (1)    The probability of success in litigation;

      (2)    The difficulties, if any, to be encountered in the matter of collection;

      (3)    The complexity of the litigation involved and the expense, inconvenience

            and delay necessary attaining it; and

      (4)    The paramount interest of the creditors and a proper deference to their

            reasonable views.

In re MGS Marketing, 111 B.R. 264, 267 (Bankr. 9th Cir. 1990); Martin v. Robinson (In re A&C

Properties), 784 F.2d 1377, 1381 (9th Cir. 1986) cert. denied, 479 U.S. 854, 107 S. Ct. 189

(1986); In re Woodson, 839 F.2d 610, 620 (9th Cir 1988).

1.    The probability of success in litigation

      Litigation is inherently risky and devoid of any certainty of outcome.  The sale of Assets

herein offers $150,000.00, subject to overbid, and provides for a significant source of

unencumbered funds in which unsecured creditors can be paid.  Accordingly, initiating litigation

in this case will likely not yield a better outcome as both the Article 9 Foreclosure of all of the

Debtor's assets and the Article 9 Sale to CTA were deemed "commercially reasonable" by the

Superior Court.  See Exhibit "3", Statement of Decision.  Additionally, litigation is generally

expensive and the litigation expenses incurred would most likely exceed any benefit that might

be achieved.

2.    The difficulties, if any, to be encountered in the matter of collection

      Collection is problematic.  The Estate will need to engage in a lengthy and costly trial,

obtain a judgment, defend any appeals, and identify assets with equity in which to collect.  All

1  this will increase administrative expenses and may not necessarily result in additional benefit for

2  creditors of the Estate.

3  3.    The complexity, expense, inconvenience and delay of litigation

4
       There will be expenses, inconvenience and delay associated with proceeding to trial.

5
   Rather than incurring expenses and resources in doing so, the parties have determined that the
6
   offer to purchase, subject to overbid, is fair and reasonable.  Based on that, the Trustee believes
7
8  that this is the most cost effective method for resolving the matter.

9  4.    The interest of creditors

10
       The Motiont should be approved as it is in the best interest of the Estate and its creditors.
11
   Under the proposed sale, the Trustee will retain at least $150,000.00 for the benefit of the Estate
12
   and its creditors.  Furthermore, the administrative expenses incurred would most likely exceed
13
14 any benefit that might be achieved.

15     In addition to the above-mentioned factors, the courts are guided by two principles.

16     First, "the law favors compromise."  Ports O'Call Investment Co. v. Blair (In re Blair), 538

17 F.2d 849, 851 (9th Cir. 1976).    Compromises "are favored in bankruptcy," 9 Collier on

18 Bankruptcy § 9019.03 at 9019-3 (15th ed. 1988), and have become "a normal part of the process

19 of reorganization."  Protective Committee for Independent Stockholders of TMT Trailer Ferry Inc.

20
   v. Anderson, 390 U.S. 414, 424, 88 S. Ct. 1157 (1968) quoting Case v. Los Angeles Lumber
21
22 Prods. Co., 308 U.S. 106, 130 (1939).

23     Second, a compromise should be approved unless it "fall[s] below the lowest point in the

24 range of reasonableness."  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2nd Cir.

25 1983), cert. denied 464 U.S. 822, 104 S. Ct. 88 (1985).  As that court aptly commented:

26
               [The] responsibility of the bankruptcy judge, and ours upon
27             review, is not to decide the numerous questions of law and fact
               raised by the appellants but rather to canvass the issues and see
28             whether the settlement fall[s] 'below the lowest point in the range

1    of reasonableness. . . .'

2  In re W.T. Grant Co., 699 F.2d at 608, cert. denied 409 U.S. 1039, 73 S.Ct. 521 (1972).

3    The compromise approval process does not contemplate that a bankruptcy court will

4  substitute its business judgment for that of a chapter 7 trustee. To the contrary, a settlement that

5  has been negotiated by a trustee, as representative of the estate, is entitled to deference. See In re

6
7  Morrison, 69 B.R. 586, 592 (Bankr. E.D. Pa. 1987) ("The objecting creditors may not substitute

8  their judgment for that of the Trustee."). Based on the above, the Trustee respectfully request that

9  the Motion be granted.

10           III.    **CONCLUSION**

11      **WHEREFORE**, the Chapter 7 Trustee prays for orders, as follows:

12      1.    That the Motion is granted;

13
14      2.    That sale of the Estate's interest in the Claims under 11 U.S.C. § 363 is approved,

15  upon the terms and conditions set forth herein, subject to overbid;

16      3.    That the Court authorize the overbid procedure as set forth herein above;

17      4.    That the Buyer be found to be a good faith purchaser pursuant to 11 U.S.C. §

18  363(m);

19      5.    That the Trustee be authorized to execute all documents necessary to consummate

20  the Sale;

21
22      6.    In the alternative, find that the settlement should be approved pursuant to Federal

23  Rule of Bankruptcy Procedure 9019.

24      7.    That the fourteen (14) day stay imposed under Fed. R. Bankr. P. 6004(h) be

25  waived; and

26      8.    For such other and further relief as the Court deems just and proper.

27

28

Respectfully submitted,

DATED: July 6, 2017

**ROQUEMORE, PRINGLE & MOORE, INC.**

By:

    John P. Pringle, Esq.
    Toan B. Chung, Esq.
    Attorneys for Charles W. Daff,
    Chapter 7 Trustee

13

**DECLARATION OF THE TRUSTEE**

I, Charles W. Daff, declare and states as follows:

1.     I am the duly appointed and acting Chapter 7 Trustee (the "Trustee") of the bankruptcy estate (the "Estate") of the above-captioned debtor Dispatch Transportation LLC (the "Debtor") in Case No. 6:16-bk-17768-MH (the "Bankruptcy Case").  I am an individual above the age of 18 years and I have personal knowledge of all the facts set forth in this Declaration and I could and would competently testify thereto if so called as a witness, except where matters are stated on information and belief, in which case I am informed and believe that the facts so stated are true and correct.

2.     The Debtor filed its Voluntary Petition under Chapter 7 of Title 11 in this case on August 30, 2016 (the "Petition Date").  The Debtor's Schedule A/B does not list any assets.  A true and correct copy of the Debtor's Schedule A/B reflecting same is attached hereto and incorporated herein as **Exhibit "1"**.

3.     I am informed and believe that all of the Debtor's assets were foreclosed (the "Article 9 Foreclosure") prepetition by Comerica Bank ("Comerica") and sold (the "Article 9 Sale") to Commodity Trucking Acquisition, LLC ("CTA" or the "Purchaser") for $12,000,000.00 on September 14, 2011 under Michigan Law pursuant to an Article 9 Purchase Agreement.  A true and correct copy of the Article 9 Purchase Agreement reflecting same is attached hereto and incorporated herein as **Exhibit "2"**.

4.     I am informed and believe that the Article 9 Foreclosure and the Article 9 Sale were the subjects of a bench trial in that State Court matter entitled Brutoco v. Commodity Trucking Holdings, LLC, et al, Case No. CIVDS1307312 (the "State Court Suit") before the San Bernardino County Superior Court (the "Superior Court").  CTA was a Defendant in the State Court Suit.  On March 20, 2015, the Superior Court issued a Statement of Decision finding that

14

both the Article 9 Foreclosure and the Article 9 Sale were "commercially reasonable." A true and correct copy of the Statement of Decision dated March 20, 2015 reflecting same is attached hereto and incorporated herein as **Exhibit "3"**.

5.    On May 8, 2015, the Superior Court issued a Judgment in favor of the Defendants, including CTA. A true and correct Judgment dated May 8, 2015 reflecting same is attached hereto and incorporated herein as **Exhibit "4"**.

6.    CTA wishes to purchase the Estate's interest in any and all claims, actions, causes of action, demands, damages, rights, judgments, sums of money, counterclaims, suits, costs, expenses, compensation, debts, dues, accounts, covenants, controversies and liabilities of every kind or nature whatsoever, direct or indirect, known or unknown, that are the property of the Estate and that any of Seller, the Debtor, the Estate and/or any of their respective predecessors, successors, assigns, heirs or affiliates (the "Seller Parties") may have against Purchaser and/or any of its predecessors, successors, heirs, assigns, past and present officers, directors, agents, parents, subsidiaries, affiliates, servants, representatives, employees and attorneys and each of them (collectively referred to as the "Purchaser Parties"), existing as of the Filing, including, without limitation, successor liability, alter ego, fraudulent transfer, and any claims any creditor or any party in interest that could have asserted on its or their own behalf under state law which are general claims with no particularized injury arising from such claims existing as of the Filing (collectively, the "Assets") for $150,000.00, subject to overbid and the Court's approval, pursuant to the terms of the Asset Purchase Agreement attached hereto and incorporated herein as **Exhibit "5"**.

7.    CTA has tendered to me a bid deposit of $4,500.00 to secure its performance. The sale shall be on an "as is, where is" basis, without any warranties, either express or implied.

8.    As set forth in the proposed bidding procedures, overbids shall be in increments of

$1,000.00. The overbidder must tender a Bid Deposit of $4,500.00 in the form of certified funds to my counsel on or before July 28, 2017 by 4:00 p.m. Pacific Time in order to bid for the Estate's interest in the Assets. If the overbidder is the winning bidder at the Sale Hearing, the Bid Deposit of said overbidder shall be non-refundable.

9.    I believe $150,000.00, subject to overbids, is a reasonable offer and the sale of the Estate's interest in the Assets would maximize the value of the Estate and is therefore in the best interest of the Estate.

10.    I complied with Loc. Bankr. R. 6004-2. A true and correct copy of Form 6004-2 which has been posted at the Clerk's Office is incorporated therein and attached hereto as **Exhibit "6"**.

11.    I am informed and believe that the sale is advertised through (1) the website of the United States Bankruptcy Court, Central District of California, Sale of Estate Property section; (2) the Twitter account of the United States Bankruptcy Court, Central District of California; and (3) the website of the National Association of Bankruptcy Trustees (the "NABT"), all of which has a nationwide audience.

12.    It is my business judgment to propose the sale and I believe that the sale will maximize the value of the Estate.

13.    I have no affiliation with CTA. The proposed sale transaction is the product of arm's length, good faith negotiations between the parties and our respective counsel. No consideration is being paid by CTA to me other than the Sale Proceeds and there is no collusion between me and CTA.

14.    I request that CTA be found to be a good faith purchaser pursuant to 11 U.S.C. § 363(m). I further request that I be authorized to execute all documents necessary to consummate the Sale.

15.     The APA was negotiated, proposed and entered into by me and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.    Neither the Purchaser or I engaged in any conduct that would cause the APA to be avoided under Section 363(n) of the Bankruptcy Code.

16.     I believe that the Purchaser is a buyer "in good faith," as that term is used in the Bankruptcy Code and the decisions thereunder, and is entitled to the protections and immunities of Section 363(m) of the Bankruptcy Code with respect to all of the Assets. The Purchaser is not an "insider" with respect to the Debtor, the Trustee or the Estate, as that term is defined under Section 101(31) of the Bankruptcy Code.

17.     In addition, I have sufficiently investigated and reviewed the alleged claims to be compromised as part of the sale, including (a) the probability of success in litigating the alleged claims and causes of action to be sold, (b) the difficulty that would be encountered in collecting on such claims, (c) the complexity, expense, inconvenience, and delay that would be attendant to pursuing such claims, and (d) the interests of creditors related to such claims.    Each of such factors supports the proposed sale and compromise, consistent with my reasoned judgment.

18.     The Purchaser would not enter into the APA to purchase the Assets other than through a sale of such Assets free and clear of all liens, including, without limitation, all "liens" as defined in Section 101(37) of the Bankruptcy Code ("Liens"), "claims" as defined in Section 101(5) of the Bankruptcy Code ("Claims"), other encumbrances on title to the Assets ("Encumbrances"), and "interests" of any kind or nature as such term is used in Section 363(f) of the Bankruptcy Code ("Interests").

19.     In my business judgment, not selling the Assets free and clear of all Liens, Claims, Encumbrances and Interests would adversely impact the Estate and would result in substantially less value to the Estate.

1      20.    Time is of the essence in consummating the sale within the time constraints set

2    forth in the APA.   Sufficient cause has been shown to determine that the stay otherwise

3    contemplated by Bankruptcy Rule 6004 is inapplicable to this Order.

4       I declare under penalty of perjury under the law of the United State of America that the

5    foregoing is true and correct on this _6_ day of ~~June~~ July, 2017 at Los Angeles, California.

6

7

8                                  Charles W. Daff,

9                                  Chapter 7 Trustee

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF JOHN SULLIVAN

I, John Sullivan, declare and state as follows:

1.      I am the Chief Operating Officer and Chief Financial Officer of Commodity Trucking Acquisition, LLC ("CTA" or the "Buyer").  I am an individual above the age of 18 years and I have personal knowledge of all the facts set forth in this Declaration and I could and would competently testify thereto if so called as a witness, except where matters are stated on information and belief, in which case I am informed and believe that the facts so stated are true and correct.

2.      CTA wishes to purchase the Estate's interest as the Assets as that term is defined in the Asset Purchase Agreement for $150,000.00, subject to overbid and the Court's approval, pursuant to the terms of the Asset Purchase Agreement attached hereto and incorporated herein as **Exhibit "5"**.

3.      On behalf of CTA, I have tendered to the Trustee a bid deposit of $4,500.00 to secure CTA's performance.  I understand that if CTA is the winning bidder at the Sale Hearing, CTA's bid deposit shall be non-refundable.  I understand that the sale shall be on an "as is, where is" basis, without any warranties, either express or implied.

4.      Neither I nor CTA has any affiliations with Chapter 7 Trustee Charles W. Daff. The proposed sale transaction is the product of arm's length, good faith negotiations between CTA, the Trustee, and our respective counsel.  No consideration is being paid by CTA to the Trustee other than the Sale Proceeds and there is no collusion between CTA and the Trustee.

5.      I request that CTA be found to be a good faith purchaser pursuant to 11 U.S.C. § 363(m).

///

///

1     I declare under penalty of perjury under the laws of the United States of America that the

2 foregoing is true and correct on this _10th_ day of July, 2017 at _Fontana_, California.

3

4                             John Sullivan, Declarant

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

**Fill in this information to identify the case:**

Debtor name  Dispatch Transportation LLC

United States Bankruptcy Court for the: Central District of California

Case number (If known):  6:16-bk-17768-MH

☐ Check if this is an
amended filing

## Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property

12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

### Part 1:    Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

   ☒ No. Go to Part 2.
   ☐ Yes. Fill in the information below.

   **All cash or cash equivalents owned or controlled by the debtor**

   Current value of debtor's interest

2. **Cash on hand**                                                                                           $_____

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

   | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
   |---|---|---|---|
   | 3.1. _____ | _____ | ___ ___ ___ ___ | $_____ |
   | 3.2. _____ | _____ | ___ ___ ___ ___ | $_____ |

4. **Other cash equivalents** *(Identify all)*                                                      0

   | | |
   |---|---|
   | 4.1. _____ | $_____ |
   | 4.2. _____ | $_____ |

5. **Total of Part 1**
   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.      $_____

### Part 2:    Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

   ☒ No. Go to Part 3.
   ☐ Yes. Fill in the information below.

   Current value of
   debtor's interest

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit

   | | |
   |---|---|
   | 7.1. _____ | $_____ |
   | 7.2. _____ | $_____ |

21

Case 6:16-bk-17768-MH    Doc 8    Filed 09/09/16    Entered 09/09/16 13:48:59    Desc
Main Document    Page 10 of 54

Debtor    Dispatch Transportation LLC    Case number (if known) 6:16-bk-17768-MH
_____
Name

**8. Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

8.1._____    $_____

8.2._____    $_____

**9. Total of Part 2.**

Add lines 7 through 8. Copy the total to line 81.    $_____

| Part 3: | Accounts receivable |
|---|---|

**10. Does the debtor have any accounts receivable?**

☒ No. Go to Part 4.

☐ Yes. Fill in the information below.

Current value of debtor's interest

**11. Accounts receivable**

11a. 90 days old or less:  _____ – _____ = ........➔    $_____
            face amount              doubtful or uncollectible accounts

11b. Over 90 days old:  _____ – _____ = ........➔    $_____
            face amount              doubtful or uncollectible accounts

**12. Total of Part 3**

Current value on lines 11a + 11b = line 12. Copy the total to line 82.    $_____

| Part 4: | Investments |
|---|---|

**13. Does the debtor own any investments?**

☒ No. Go to Part 5.

☐ Yes. Fill in the information below.

| | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|

**14. Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

14.1. _____    _____    $_____

14.2. _____    _____    $_____

**15. Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity:                              % of ownership:

15.1. _____    _____%    _____    $_____

15.2. _____    _____%    _____    $_____

**16. Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

16.1. _____    _____    $_____

16.2. _____    _____    $_____

**17. Total of Part 4**

Add lines 14 through 16. Copy the total to line 83.    $_____

Official Form 206A/B    Schedule A/B: Assets — Real and Personal Property    page 2

22

Debtor    Dispatch Transportation LLC                                              Case number (if known)    6:16-bk-17768-MH
          Name

---

| **Part 5:** | **Inventory, excluding agriculture assets** |

18. **Does the debtor own any inventory (excluding agriculture assets)?**

  ☒ No. Go to Part 6.

  ☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|

19. **Raw materials**

  _____    ___/___/___    $_____    _____    $_____
                             MM / DD / YYYY

20. **Work in progress**

  _____    ___/___/___    $_____    _____    $_____
                             MM / DD / YYYY

21. **Finished goods, including goods held for resale**

  _____    ___/___/___    $_____    _____    $_____
                             MM / DD / YYYY

22. **Other inventory or supplies**

  _____    ___/___/___    $_____    _____    $_____
                             MM / DD / YYYY

23. **Total of Part 5**

  Add lines 19 through 22. Copy the total to line 84.                                        $_____

24. **Is any of the property listed in Part 5 perishable?**

  ☐ No

  ☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

  ☐ No

  ☐ Yes. Book value _____    Valuation method_____    Current value_____

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**

  ☐ No

  ☐ Yes

---

| **Part 6:** | **Farming and fishing-related assets (other than titled motor vehicles and land)** |

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

  ☒ No. Go to Part 7.

  ☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

28. **Crops—either planted or harvested**

  _____    $_____    _____    $_____

29. **Farm animals** *Examples:* Livestock, poultry, farm-raised fish

  _____    $_____    _____    $_____

30. **Farm machinery and equipment**  (Other than titled motor vehicles)

  _____    $_____    _____    $_____

31. **Farm and fishing supplies, chemicals, and feed**

  _____    $_____    _____    $_____

32. **Other farming and fishing-related property not already listed in Part 6**

  _____    $_____    _____    $_____

---

Official Form 206A/B                    Schedule A/B: Assets — Real and Personal Property                    page 3

23

Case 6:16-bk-17768-MH    Doc 8    Filed 09/09/16    Entered 09/09/16 13:48:59    Desc
Main Document    Page 12 of 54

Debtor    Dispatch Transportation LLC    Case number (if known)  6:16-bk-17768-MH
         Name

---

33. **Total of Part 6.**

   Add lines 28 through 32. Copy the total to line 85.    $_____

34. **Is the debtor a member of an agricultural cooperative?**

   ☐ No

   ☐ Yes. Is any of the debtor's property stored at the cooperative?

       ☐ No

       ☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

   ☐ No

   ☐ Yes. Book value $_____    Valuation method _____    Current value $_____

36. **Is a depreciation schedule available for any of the property listed in Part 6?**

   ☐ No

   ☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

   ☐ No

   ☐ Yes

---

**Part 7:    Office furniture, fixtures, and equipment; and collectibles**

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

   ☒ No. Go to Part 8.

   ☐ Yes. Fill in the information below.

   | General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
   |---|---|---|---|
   | 39. **Office furniture** | | | |
   | _____ | $_____ | _____ | $_____ |
   | 40. **Office fixtures** | | | |
   | _____ | $_____ | _____ | $_____ |
   | 41. **Office equipment, including all computer equipment and communication systems equipment and software** | | | |
   | _____ | $_____ | _____ | $_____ |
   | 42. **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
   | 42.1 _____ | $_____ | _____ | $_____ |
   | 42.2 _____ | $_____ | _____ | $_____ |
   | 42.3 _____ | $_____ | _____ | $_____ |

43. **Total of Part 7.**

   Add lines 39 through 42. Copy the total to line 86.    $_____

44. **Is a depreciation schedule available for any of the property listed in Part 7?**

   ☐ No

   ☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**

   ☐ No

   ☐ Yes

---

Official Form 206A/B    Schedule A/B: Assets —Real and Personal Property    page 4

24

Debtor    Dispatch Transportation LLC    Case number (if known) 6:16-bk-17768-MH
_____
Name

| Part 8: | Machinery, equipment, and vehicles |

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

☒ No. Go to Part 9.

☐ Yes. Fill in the information below.

| General description<br><br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br><br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles**

47.1 _____    $_____    _____    $_____

47.2 _____    $_____    _____    $_____

47.3 _____    $_____    _____    $_____

47.4 _____    $_____    _____    $_____

48. **Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

48.1 _____    $_____    _____    $_____

48.2 _____    $_____    _____    $_____

49. **Aircraft and accessories**

49.1 _____    $_____    _____    $_____

49.2 _____    $_____    _____    $_____

50. **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

_____    $_____    _____    $_____

51. **Total of Part 8.**

Add lines 47 through 50. Copy the total to line 87.    $_____

52. **Is a depreciation schedule available for any of the property listed in Part 8?**

☐ No

☐ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☐ No

☐ Yes

Debtor   Dispatch Transportation LLC                                        Case number (if known)   6:16-bk-17768-MH
         Name

## Part 9:   Real property

54. **Does the debtor own or lease any real property?**

☒ No. Go to Part 10.

☐ Yes. Fill in the information below.

55. **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.2 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.3 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.4 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.5 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.6 _____ | _____ | $ _____ | _____ | $ _____ |

56. **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.          $ _____

57. **Is a depreciation schedule available for any of the property listed in Part 9?**

☐ No

☐ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☐ No

☐ Yes

## Part 10:   Intangibles and Intellectual Property

59. **Does the debtor have any interests in intangibles or intellectual property?**

☒ No. Go to Part 11.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60. **Patents, copyrights, trademarks, and trade secrets** _____ | $ _____ | _____ | $ _____ |
| 61. **Internet domain names and websites** _____ | $ _____ | _____ | $ _____ |
| 62. **Licenses, franchises, and royalties** _____ | $ _____ | _____ | $ _____ |
| 63. **Customer lists, mailing lists, or other compilations** _____ | $ _____ | _____ | $ _____ |
| 64. **Other intangibles, or intellectual property** _____ | $ _____ | _____ | $ _____ |
| 65. **Goodwill** _____ | $ _____ | _____ | $ _____ |

66. **Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.          $ _____

26

Debtor    Dispatch Transportation LLC                                    Case number (if known)    6:16-bk-17768-MH
         Name

67. **Do your lists or records include personally identifiable information of customers (as defined in 11 U.S.C. §§ 101(41A) and 107)?**
   ☐ No
   ☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
   ☐ No
   ☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
   ☐ No
   ☐ Yes

## Part 11:    All other assets

70. **Does the debtor own any other assets that have not yet been reported on this form?**
   Include all interests in executory contracts and unexpired leases not previously reported on this form.
   ☒ No. Go to Part 12.
   ☐ Yes. Fill in the information below.

|   |   | Current value of debtor's interest |
|---|---|---|

71. **Notes receivable**
   Description (include name of obligor)
   _____    _____ — _____  = → $_____
                              Total face amount    doubtful or uncollectible amount

72. **Tax refunds and unused net operating losses (NOLs)**
   Description (for example, federal, state, local)
   _____    Tax year _____    $_____
   _____    Tax year _____    $_____
   _____    Tax year _____    $_____

73. **Interests in insurance policies or annuities**
                                                                    $_____

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**
   _____                         $_____
   Nature of claim    _____
   Amount requested    $_____

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**
   _____                         $_____
   Nature of claim    _____
   Amount requested_    $_____

76. **Trusts, equitable or future interests in property**
   _____                         $_____

77. **Other property of any kind not already listed**    Examples: Season tickets, country club membership
   _____                         $_____
                                                                    $_____

78. **Total of Part 11.**
   Add lines 71 through 77. Copy the total to line 90.                $_____

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**
   ☐ No
   ☐ Yes

27

Case 6:16-bk-17768-MH    Doc 8    Filed 09/09/16    Entered 09/09/16 13:48:59    Desc
Main Document    Page 16 of 54

Debtor    Dispatch Transportation LLC    Case number *(if known)* 6:16-bk-17768-MH
          Name

| Part 12: | Summary |

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 0.00 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 0.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment, and collectibles.** *Copy line 43, Part 7.* | $ 0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 0.00 | |
| 88. **Real property.** *Copy line 56, Part 9.* ..... ➔ | | $ 0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column. ..........91a. | $ 0.00 | + 91b. $ 0.00 |

92.    **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. ..................................................    $ 0.00

28

# EXHIBIT "2"

EXECUTION COPY

## ARTICLE 9 PURCHASE AGREEMENT

Commodity Trucking Acquisition, LLC ("Buyer"), a California limited liability company, and Comerica Bank ("Secured Party"), a Texas banking corporation, as secured party, enter into this Article 9 Purchase Agreement ("Agreement") as of September 14, 2011.

### RECITALS

A.     Secured Party loaned and/or advanced money on a secured basis to Dispatch Transportation, LLC, a Delaware limited liability company ("Borrower"), under various notes and other loan and security documents, mortgages, assignments, pledges and forbearance agreements (each as amended and restated from time-to-time and collectively, the "Loan Documents"). Borrower defaulted on its obligations under the Loan Documents.

B.     Buyer desires to buy all of Borrower's right, title and interest in and to certain personal property owned by and in possession of Borrower and located at the locations listed in *Exhibit A* attached hereto. Secured Party has agreed to a sale of certain of Borrower's personal property in accordance with this Agreement.

C.     On June 27, 2011, Buyer and Secured Party entered into that certain letter agreement (the "Letter") regarding the Sale (as defined below) set forth in this Agreement. This Agreement is intended to supersede the Letter, which shall be of no further legal force or effect.

Buyer and Secured Party (collectively, the "parties" and each a "party") agree as follows:

### TERMS AND CONDITIONS

1.     **Purchase of Personal Property.** On September 14, 2011 (or such later date as may be mutually agreed in writing by Buyer and Secured Party but in any event not later than the Outside Closing Date (as defined below)) (the "Closing Date"), Buyer shall purchase from Secured Party and Secured Party shall sell to Buyer the Purchased Assets (defined below), "AS IS" and "WHERE IS" and without representation or warranty of any kind except as expressly stated herein in exchange for payment of $12,000,000.00 (the "Purchase Price") in immediately available funds. Buyer and Secured Party further acknowledge and agree that the aggregate value of the tangible personal property purchased by Buyer and included on Exhibit B is equal to $2,385,000. Secured Party shall not be responsible for paying any transfer, sales or use tax or any retitling or recording fees or costs associated with the Sale (defined below). Buyer shall indemnify and hold harmless Secured Party from any claims, losses or damages resulting from any failure by Buyer to pay all applicable transfer, sales or use tax or any retitling or recording fees or costs associated with the Sale. "Purchased Assets" means all of Borrower's right, title and interest in and to the assets located at the locations listed in the attached *Exhibit A* and described in the attached *Exhibit B*.

Buyer and Secured Party acknowledge and agree that the private foreclosure sale transaction contemplated hereby (the "Sale") does not include any of Borrower's assets other than the Purchased Assets ("Excluded Assets"), including without limitation all Excluded Assets as defined in Exhibit B, and that none of the Purchased Assets are "consumer goods" under the UCC.

2.    **Terms of Personal Property Sale.**  On the Closing Date, Buyer shall pay to Secured Party the Purchase Price in immediately available funds, without setoff, deduction, or recoupment of any kind.  In that regard:

(a)    Subject to the terms and conditions set forth in this Agreement, the parties agree that the Sale shall constitute a private foreclosure sale under Sections 9-610 *et seq.* of the Uniform Commercial Code as enacted in the State of Michigan ("UCC"), other applicable law and the Loan Documents, of all of Borrower's right, title and interest in and to all of the Purchased Assets.  Upon consummation of the Sale on the Closing Date (the "Closing"), the effect of the disposition and the rights of Buyer are as specified in Section 9-617(a) and (b) of the UCC and the Secured Party's liens and security interests on the Purchased Assets shall be discharged.  Following the Closing, upon written request by Buyer, Secured Party will file partial releases of all UCC financing statements listing Borrower as Debtor in all applicable jurisdictions, solely to the extent of, and for the purpose of, releasing any and all security interests held by Secured Party in or to the Purchased Assets;

(b)    In accordance with Sections 9-610 *et seq.* of the UCC, on August 2, 2011 Secured Party requested a UCC search regarding Borrower in Delaware.  On August 25, 2011, Secured Party sent notices in the form of *Exhibit C* attached hereto (the "Notice of Disposition") with respect to the Sale contemplated hereby to: (i) all persons and entities required to be notified under Section 9-611(c) of the UCC; and (ii) any other person requested by Buyer, to such addresses as were listed in writing by Buyer and delivered to Secured Party.  **EXCEPT AS EXPRESSLY PROVIDED HEREIN, SECURED PARTY MAKES NO WARRANTIES, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS.  SECURED PARTY EXPRESSLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND ALL WARRANTIES ON DISPOSITION.  IN ADDITION, SECURED PARTY MAKES NO REPRESENTATION OR WARRANTY THAT BORROWER HAS ANY RIGHT, TITLE OR INTEREST IN ANY ASSET OF ANY SUBSIDIARY OF BORROWER, INCLUDING WITHOUT LIMITATION ASSETS OF WESTERN TRANSPORTATION, LLC OR LB CRUSHING, LLC, AND SECURED PARTY MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE NATURE OR SCOPE OF BORROWER'S RIGHT, TITLE AND INTEREST IN ANY OF THE OTHER PURCHASED ASSETS;**

(c)    NEITHER SECURED PARTY NOR BUYER IS ASSUMING AND NEITHER SHALL BE LIABLE FOR ANY DEBT, OBLIGATION, RESPONSIBILITY OR LIABILITY OF BORROWER, ANY OTHER OBLIGOR UNDER ANY OF THE LOAN DOCUMENTS (TOGETHER WITH BORROWER, EACH, A "CREDIT PARTY" AND COLLECTIVELY, THE "CREDIT PARTIES") OR OF ONE ANOTHER, WHETHER KNOWN OR UNKNOWN, CONTINGENT OR ABSOLUTE OR OTHERWISE AND WHETHER RELATING TO THE PURCHASED ASSETS, THE EXCLUDED ASSETS OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY DEBT, OBLIGATION, RESPONSIBILITY OR LIABILITY WITH RESPECT TO EQUIPMENT

2

LEASES, REAL PROPERTY LEASES OR CONTRACTS. IN FURTHERANCE AND
NOT IN LIMITATION OF THE FOREGOING, BUYER DOES NOT ASSUME ANY
LIABILITY UNDER ANY EQUIPMENT LEASE, REAL PROPERTY LEASE OR
OTHER CONTRACT UNLESS BUYER AFFIRMATIVELY ASSUMES SUCH
LIABILITY IN WRITING, WHICH MAY OCCUR AT OR FOLLOWING THE
CLOSING IN THE SOLE DISCRETION OF BUYER; and

(d)     Upon payment in full of the Purchase Price, Secured Party shall deliver a fully
executed copy of the Secured Party Bill of Sale attached as *Exhibit D* to Buyer. If there is
any conflict between this Agreement and the Secured Party Bill of Sale with respect to the
transfer of the Purchased Assets, the Secured Party Bill of Sale shall control; and

(e)     Upon closing, Secured Party, Buyer and Borrower shall execute an Assignment of
Deposit Accounts Held at Comerica Bank (the "Assignment of Accounts") in the form
attached as *Exhibit E*, and Buyer shall deliver to Secured Party the signature cards and
taxpayer certifications described in paragraph 6(iii) of the Assignment of Accounts within
the time set forth in the Assignment of Accounts. All automated clearing house (ACH)
transfers out of the accounts that are the subject of the Assignment of Accounts must be
prefunded with immediately available funds, which may include Buyer Cash (as defined in
Section 8, below). Buyer further agrees to close all deposit accounts of Borrower
transferred to Buyer hereunder and maintained with Secured Party within sixty (60) days
after Closing. Nothing in this subsection (e) shall prevent Buyer from establishing new
deposit and other accounts with Secured Party, including payroll and other accounts with
ACH capability, in accordance with Secured Party's standards for establishing such
accounts in the ordinary course of business.

        3.     **Right to Possession.** Secured Party acknowledges and agrees that upon payment
in full for the Purchased Assets, Buyer will own all of Borrower's rights in the Purchased Assets
subject to the terms of this Agreement. With regard to taking possession of the Purchased Assets:

(a)     Buyer shall take possession of the Purchased Assets directly from Borrower at the
locations specified in Recital B above (collectively, the "Premises");

(b)     Buyer acknowledges that it has been informed that Hazardous Substances (as
defined below) exist or may exist in, on and/or under the Premises. Buyer acknowledges it
has received, from Borrower and certain affiliates thereof, certain environmental
assessment reports with regard to conditions at the Premises, which reports identify the
presence and location of certain but not necessarily all Hazardous Substances. Buyer
waives and releases any claim now or in the future against Secured Party related to
Secured Party's disclosure of or failure to disclose conditions on, at or under the Premises;

(c)     Buyer agrees that it will exercise due care in entering the Premises, inspecting
and/or taking possession of the Purchased Assets, and removing the Purchased Assets to
avoid damage to the Premises, other personal property and fixtures. Buyer will undertake
all appropriate investigations and preventative measures to insure that actions which it or
its employees, agents or contractors undertake to inspect, take possession of or remove the
Purchased Assets from the Premises will not exacerbate any existing contamination or

3

oit_1120256_2|
#1561186 v2 den

Detroit_1121914_3

3|

Hazardous Substances and that it will not cause the release, threat of release, or disposal (as those terms are construed under any applicable state and federal law) of any Hazardous Substances. Buyer shall comply with all applicable laws and regulations while on the Premises with particular attention to laws which relate to Hazardous Substances. Buyer shall notify its employees, agents and contractors about the presence of Hazardous Substances in sufficient detail so that they can exercise due care in their activities. Buyer shall inform Secured Party immediately and in writing in the event that any actions taken damage property or cause the disposal or the release or threat of release of Hazardous Substances. Buyer shall require of any person with whom it contracts for services with regard to inspection, possession or removal of the Purchased Assets that such person undertake all of the obligations of this paragraph; and

(d)     "Hazardous Substance" means any substance regulated under federal, state or local law or regulation because of potential adverse impacts on safety, health or the environment.

4.     **Indemnity.** Buyer agrees to indemnify, defend (with counsel of Secured Party's selection) and hold harmless Secured Party, its employees, officers, directors, attorneys, agents, stockholders, affiliates, successors and assigns, against any Claims (defined below) in connection with, relating to or arising from (a) Buyer's entry on to or into the Premises and taking possession of the Purchased Assets; (b) Buyer's possession and use of the Purchased Assets; or (c) any breach by Buyer or its employees, agents or contractors of any term of this Agreement. The negligence of Secured Party, its employees, agents or contractors shall not be a defense to Buyer's obligation to indemnify Secured Party nor diminish Secured Party's indemnification rights, although gross negligence, or reckless or intentional misconduct by Secured Party, its employees, agents or contractors shall be such a defense. With regard to this indemnity:

(a)     "Claims" means: any demand, claim, action or cause of action, damage, liability, loss, cost, debt, expenses, obligation, charge, lawsuit, contract, agreement, undertaking or deficiency, of any kind or nature, whether known or unknown, fixed, actual, accrued or contingent, liquidated or unliquidated (including interest, penalties, fees and expenses of expert witnesses and other consultants, attorneys' fees and other costs and expenses incident to proceedings or investigations relating to any of the foregoing or the defense of any of the foregoing), whether or not litigation has commenced.

(b)     The foregoing indemnity shall survive Closing and termination of this Agreement.

5.     **Buyer's Representations.** Buyer acknowledges, represents, and agrees that:

(a)     it is legally authorized to enter into this Agreement;

(b)     this Agreement constitutes its legal, valid and binding obligation and is enforceable against it in accordance with its terms, except to the extent that such enforcement is limited by principles of equity and laws relating to bankruptcy and creditors' rights;

(c)     it (i) has such knowledge and experience in financial and environmental matters that it is capable of evaluating the merits and risks of the purchase of the Purchased Assets;

4

(ii) is knowledgeable regarding the financial status of Borrower and the Article 9 sale of the Purchased Assets and the environmental condition of the Purchased Assets and Premises; (iii) has agreed to purchase the Purchased Assets on the basis of its own independent investigation and environmental evaluation and has not sought or relied upon any representation or warranty from Secured Party except as expressly set forth in this Agreement, and (iv) has made and will continue to make, independently and without reliance upon Secured Party and based on such documents and information as it has deemed appropriate, its own independent investigations, environmental evaluations and decisions relating to the Purchased Assets;

(d)    it has not retained, utilized or been represented by any broker or finder, in connection with the Sale contemplated by this Agreement, that could assert any claim or lien against Secured Party; and

(e)    it is acting in good faith (as such term is defined in Section 9-102(a)(43) of the UCC) in connection with this Agreement and the Sale contemplated herein.

The representations, warranties and covenants of Buyer contained in this Agreement shall survive the Closing.

6.    **Secured Party's Representations.**  Secured Party represents, warrants and covenants to Buyer as follows:

(a)    Secured Party is a banking corporation, duly organized, validly existing and in good standing under the laws of the State of Texas.  Secured Party has the power and authority (i) to sell the Purchased Assets under applicable law, (ii) to execute and deliver this Agreement and (iii) to carry out all of the actions required of it pursuant to the terms of this Agreement;

(b)    This Agreement has been duly executed and delivered by Secured Party and constitutes the legal, valid and binding obligation of Secured Party, enforceable against Secured Party in accordance with its terms, except to the extent that such enforcement is limited by principles of equity and laws relating to bankruptcy and creditors' rights;

(c)    Secured Party has a valid and enforceable security interest in the Purchased Assets;

(d)    Secured Party has not heretofore sold, assigned, transferred, subordinated or participated any of its interests in the Loan Documents, and has not heretofore conducted an Article 9 sale of the Purchased Assets;

(e)    As of August 31, 2011, the total amount of the obligations of Borrower outstanding under the Loan Documents is not less than $55,000,000.00;

(f)    Secured Party has not retained, utilized or been represented by any broker or finder, in connection with the Sale contemplated by this Agreement, that could assert any claim or lien against Buyer or the Purchased Assets; and

5

(g)     Secured Party is acting in good faith (as such term is defined in Section 9-102(a)(43) of the UCC) in connection with this Agreement and the Sale contemplated herein.

The representations, warranties and covenants of Secured Party contained in this Agreement shall survive the Closing.

7.   **Liabilities and Liens Remain Outstanding.**  Except to the extent of the cash Purchase Price received from Buyer, which shall be actually and finally applied by Secured Party to the obligations of Borrower under the Loan Documents as it determines in its sole and absolute discretion, the obligations of Borrower and each Credit Party under the Loan Documents shall remain outstanding, and Secured Party does not release any, but instead specifically reserves, all rights, claims, security interests, liens and encumbrances (including all rights to recover any deficiency regarding the obligations of Borrower and each Credit Party under the Loan Documents), all rights against Credit Parties under the Loan Documents and otherwise, and all rights in or with respect to the Excluded Assets that are not sold to Buyer in accordance with this Agreement.  The parties do not intend the Sale to be (nor shall the Sale be deemed to be) a "strict foreclosure" or "acceptance of collateral in full satisfaction of any secured obligation" as described in § 9-620 of the UCC.

8.     **Agreement Concerning Proceeds of Excluded Assets and Purchased Assets.**  Buyer agrees that it will promptly turn over to Secured Party, for application to the obligations of Borrower under the Loan Documents in such manner as Secured Party elects in its sole discretion (without any deduction against the Purchase Price), all cash, cash equivalents, checks and other items of payment which are received by it or otherwise come into its possession and which are part of any Excluded Assets not sold to Buyer or any other assets not sold to Buyer (all such cash, cash equivalents, checks and other items of payment, collectively, the "Lender Cash").  Prior to delivery to Secured Party of any Lender Cash, Buyer will segregate and not commingle such Lender Cash with any other funds or property.  In addition, subject to Section 2(e) hereof, Secured Party agrees that it will promptly turn over to Buyer, by mailing via express overnight mail to:

PNC Bank c/o Commodity Trucking Acquisition LLC
Lockbox Number 911595
Pasadena Tech Center
465 N Halstead St. Ste. 160
Pasadena Ca 91107

all cash, cash equivalents, checks and other items of payment which is received by it or otherwise comes into its possession and which constitutes part of the Purchased Assets sold to Buyer, including, without limitation, all proceeds of Purchased Assets deposited after the Closing Date into any lockbox or other bank account of Borrower, to the extent there are any such lockboxes or accounts which have not been assigned to Buyer under Section 2(e) hereof (all such cash, cash equivalents, checks and other items of payment, collectively, the "Buyer Cash"), or following the closing of any such lockboxes or other accounts (to the extent that any such Buyer Cash is not otherwise returned to sender).  Secured Party shall reasonably account for all such Buyer Cash.

oit_1120256_2¦
#1561186 v2 den

Detroit_1121914_3

*34*

9.    **Agreement Concerning Letters of Credit.**  Secured Party has issued the following outstanding letter of credit that relates to the operation of Borrower's business:

No. 5733020; Amt.: $222,730; Beneficiary: Comerica Bank

(the "Letter of Credit").  At Closing, Buyer shall cause the Letter of Credit to be either (a) replaced with a substitute letter of credit in favor of the beneficiary and shall cause the beneficiary to return the original Letter of Credit to Secured Party with instructions to cancel it, or (b) collateralized by a transfer of funds to Secured Party in the outstanding amount of the Letter of Credit ("Cash Collateral"), which Cash Collateral shall be deposited in a blocked cash collateral account in the name of Buyer, and replaced no later than 10 business days following Closing with a substitute letter of credit in favor of the beneficiary (from an issuer and in form satisfactory to the beneficiary), at which time Buyer shall cause the beneficiary to return the original Letter of Credit to Secured Party with instructions to cancel it and Secured Party shall return to Buyer all Cash Collateral deposited with Secured Party, and any interest or accruals thereon.  Buyer shall also reimburse Secured Party for any amounts drawn on the Letter of Credit on or after the date of this Agreement, and any such reimbursed amounts shall be deducted from the amount of any substitute letter of credit or any Cash Collateral deposited with Secured Party in accordance with this Section 9.  If Buyer does not replace the Letter of Credit concurrently with the Closing, then Buyer shall execute at Closing a Pledge and Security Agreement in the form attached as *Exhibit F*, granting Secured Party a security interest in the Cash Collateral.

10.    **Buyer's Conditions to Closing; Deliveries to Buyer at Closing.**  The obligation of Buyer to consummate the Closing shall be subject to the satisfaction, at or prior to Closing, of the following conditions (to the extent non-compliance is not waived in writing by Buyer in its sole discretion):

(a)    The Notice of Disposition shall have been given by Secured Party to all persons and entities entitled to notice under the UCC or applicable law and who have not effectively waived in writing after default their right to receive such notice prior to the Closing Date.

(b)    Buyer shall have received the duly executed Secured Party Bill of Sale in the form of *Exhibit D* attached hereto, dated as of the Closing Date.

(c)    All representations, certifications and warranties of Secured Party hereunder shall be true and correct as of the Closing Date in every material respect.

(d)    All representations, certifications and warranties of the Credit Parties in the Acknowledgment and Consent attached hereto shall have been executed by all of the Credit Parties and all such representations, certifications and warranties shall be true and correct as of the Closing Date in every material respect.

(e)    Secured Party shall have performed and complied with, in all material respects, all agreements, covenants and conditions required by this Agreement to be performed or complied with by Secured Party prior to or at the Closing.

7

(f)     There will be no statute, rule, regulation or order of any court or administrative agency in effect that prohibits Secured Party, any Credit Party or Buyer from consummating the foreclosure sale transaction contemplated hereby.

(g)     No violation of law shall have occurred that could, in Buyer's reasonable judgment, have a material adverse impact on Buyer's ability to consummate the foreclosure sale transaction contemplated hereby.

(h)     No action, inquiry or investigation shall have been instituted or pending which (unless dismissed with prejudice) is reasonably likely to make illegal, or to otherwise restrain or prohibit, the consummation of the foreclosure sale transaction contemplated by this Agreement.  There will be no pending stay, bankruptcy or insolvency petition, appointment of a receiver by or on behalf of any Credit Party or any other action, suit, proceeding or order against any Credit Party which would prohibit the consummation of the foreclosure sale transaction contemplated by this Agreement or have any real or potential material adverse effect.

(i)     The Closing shall have occurred on or before September 22, 2011 (the "Outside Closing Date").

(j)     From May 24, 2011 through Closing, Secured Party shall not have exercised any right of set off or banker's lien against any funds or securities maintained by Borrower with Secured Party or taken any other action to realize against cash, cash equivalents, securities accounts or deposit accounts of Borrower, and Secured Party shall provide a written certificate to Buyer at the Closing confirming the satisfaction of this condition as of the Closing Date.

(k)     On or before the Closing Date, all Credit Parties shall have entered into written agreements with Secured Party to restructure all obligations owed to Secured Party by the Credit Parties, either directly or indirectly as guarantors.

(l)     On or before the Closing Date, Secured Party and Buyer shall have entered into a Subordination, Attornment and Non-Disturbance Agreement covering the new lease of the Fontana property.

11.     **Secured Party's Conditions to Closing; Delivery to Secured Party at Closing**. The obligation of Secured Party to consummate the Closing shall be subject to the satisfaction, at or prior to Closing, of the following conditions (to the extent noncompliance is not waived in writing by Secured Party in its sole discretion):

(a)     Secured Party shall have received the Purchase Price in accordance with this Agreement.

(b)     All representations, certifications and warranties of Buyer hereunder shall be true and correct as of the Closing Date in every material respect.

8

(c)      Buyer shall have performed and complied with, in all material respects, all agreements, covenants and conditions required by this Agreement to be performed or complied with by the Buyer, prior to or at the Closing.

(d)      There shall be no statute, rule, regulation or order of any court or administrative agency in effect that prohibits any of Secured Party, any Credit Party or Buyer from consummating the foreclosure sale transactions contemplated hereby.

(e)      No violation of law shall have occurred that could, in Secured Party's reasonable judgment, have a material adverse impact on any of Secured Party's ability to consummate the foreclosure sale transactions contemplated hereby.

(f)      Secured Party shall have received such other documents, instruments or certificates as Secured Party may reasonably request with respect to any matter relevant to this Agreement, the transfer of the Purchased Assets or the foreclosure sale transaction contemplated by this Agreement.

(g)      No action, inquiry or investigation shall have been instituted or pending that (unless dismissed with prejudice) is reasonably likely to make illegal, or to otherwise restrain or prohibit, the consummation of the foreclosure sale transaction contemplated by this Agreement.  There will be no pending stay, bankruptcy or insolvency petition, appointment of a receiver by or on behalf of any Credit Party or any other action, suit, proceeding or order against any Credit Party that would prohibit the consummation of the foreclosure sale transactions contemplated by this Agreement or have any real or potential material adverse effect.

(h)      All necessary governmental laws have been complied with and all necessary governmental approvals shall have been received.

(i)      The Closing shall have occurred on or before the Outside Closing Date.

(j)      Secured Party shall have received a fully executed copy of the Acknowledgment and Consent to this Agreement executed by each of the Credit Parties.

(k)      On or before the Closing Date, all Credit Parties shall have entered into written agreements with Secured Party to restructure all obligations owed to Secured Party by the Credit Parties, either directly or indirectly as guarantors.

(l)      On or before the Closing Date, Buyer and Borrower shall have executed and delivered to Secured Party the Assignment of Accounts in the form attached as *Exhibit E* and Buyer shall deliver to Secured Party the signature cards and taxpayer certifications described in paragraph 6(iii) of the Assignment of Accounts within the time limit set forth therein.

12.      **Severability**.  Should any provision of this Agreement be held invalid, prohibited or unenforceable in any one jurisdiction it shall, as to that jurisdiction only, be ineffective to the extent of such holding without invalidating the remaining provisions of this Agreement, and any

9

37

such holding does not invalidate or render unenforceable that provision in any other jurisdiction wherein it would be valid and enforceable; provided, however, that this provision shall not be deemed to allow any party to assume or reject some parts, but not all, of this Agreement.

13.    **Authorization.**  The individuals executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the party that they purport to represent and that their signatures bind said party to the terms of this Agreement.

14.    **Sections/Paragraph Headings.**  The section and paragraph headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation of this Agreement.  All references to paragraphs, Sections, Schedules, and Exhibits are to paragraphs, sections, schedules, and exhibits in or to this Agreement unless otherwise specified.

15.    **Waivers and Amendments; Assigns.**  No term or provision of this Agreement may be waived, altered, modified, or amended except by a written instrument, duly executed by Buyer and Secured Party.  Buyer may not assign or transfer any right or obligation under this Agreement without the prior written consent of Secured Party, except that Buyer may assign or transfer all of Buyer's rights and obligations under this Agreement to an entity that is an affiliate of Buyer without the consent of Secured Party but upon written notice to Secured Party, provided that such assignment does not release Buyer from its obligations under this Agreement.

16.    **Governing Law and Forum.**  This Agreement is made in the State of California and shall be governed by, and construed and enforced in accordance with, the laws of the State of California.  The parties agree that the federal and state courts sitting in Los Angeles County, California, have personal jurisdiction over the parties and that proper jurisdiction and venue for any dispute arising from or under this Agreement shall be in the federal or state courts sitting in Los Angeles County, California.

17.    **No Other Intended Third Party Beneficiary.**  The parties acknowledge and agree that the rights and interests of the parties under this Agreement are intended to benefit solely the parties to this Agreement.

18.    **Counterparts.**  This Agreement may be executed in any number of counterparts and by each party hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart. Each party agrees that its respective signature may be delivered by facsimile and that facsimile signatures shall be treated as original signatures for all purposes.  Any party who chooses to deliver its signature by facsimile agrees to provide promptly to the other parties a copy of this Agreement with its inked signature.

19.    **Entire Agreement.**  This Agreement and the related written schedules, exhibits and agreements delivered in connection herewith and therewith contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings relating to the subject matter hereof (whether written or oral).

10

oit_1120256_2
#1561186 v2 den

Detroit_1121914_3

20.    **CONSULTATION WITH COUNSEL. THE PARTIES ACKNOWLEDGE
THAT THEY HAVE BEEN GIVEN THE OPPORTUNITY TO CONSULT WITH
COUNSEL BEFORE EXECUTING THIS AGREEMENT AND ARE EXECUTING SUCH
AGREEMENT WITHOUT DURESS OR COERCION AND WITHOUT RELIANCE ON
ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS OTHER THAN
THOSE REPRESENTATIONS, WARRANTIES AND COMMITMENTS SET FORTH IN
THIS AGREEMENT.**

21.    WAIVER OF JURY TRIAL. THE PARTIES ACKNOWLEDGE THAT THE
RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT
MAY BE WAIVED. THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND
WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES
ARISING OUT OF OR IN RELATION TO THIS AGREEMENT. NO PARTY SHALL BE
DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL
UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE
PARTY TO WHICH SUCH RELINQUISHMENT WILL BE CHARGED.

22.    JUDICIAL REFERENCE PROVISION.

(a) IN THE EVENT THE JURY TRIAL WAIVER SET FORTH ABOVE IS NOT
ENFORCEABLE, THE PARTIES TO THIS AGREEMENT ("PARTIES") ELECT TO
PROCEED UNDER THIS JUDICIAL REFERENCE PROVISION.

(b) WITH THE EXCEPTION OF THE ITEMS SPECIFIED IN CLAUSE (c), BELOW,
ANY CONTROVERSY, DISPUTE OR CLAIM (EACH, A "CLAIM") BETWEEN THE
PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE LOAN
DOCUMENTS, WILL BE RESOLVED BY A REFERENCE PROCEEDING IN
CALIFORNIA IN ACCORDANCE WITH THE PROVISIONS OF SECTIONS 638 ET
SEQ. OF THE CALIFORNIA CODE OF CIVIL PROCEDURE ("CCP"), OR THEIR
SUCCESSOR SECTIONS, WHICH SHALL CONSTITUTE THE EXCLUSIVE
REMEDY FOR THE RESOLUTION OF ANY CLAIM, INCLUDING WHETHER THE
CLAIM IS SUBJECT TO THE REFERENCE PROCEEDING. EXCEPT AS
OTHERWISE PROVIDED IN THE LOAN DOCUMENTS, VENUE FOR THE
REFERENCE PROCEEDING WILL BE IN THE STATE OR FEDERAL COURT IN
THE COUNTY OR DISTRICT WHERE THE REAL PROPERTY INVOLVED IN THE
ACTION, IF ANY, IS LOCATED OR IN THE STATE OR FEDERAL COURT IN THE
COUNTY OR DISTRICT WHERE VENUE IS OTHERWISE APPROPRIATE UNDER
APPLICABLE LAW (THE "COURT").

(c) THE MATTERS THAT SHALL NOT BE SUBJECT TO A REFERENCE ARE THE
FOLLOWING: (I) NONJUDICIAL FORECLOSURE OF ANY SECURITY INTERESTS
IN REAL OR PERSONAL PROPERTY, (II) EXERCISE OF SELF-HELP REMEDIES
(INCLUDING, WITHOUT LIMITATION, SET-OFF), (III) APPOINTMENT OF A
RECEIVER AND (IV) TEMPORARY, PROVISIONAL OR ANCILLARY REMEDIES
(INCLUDING, WITHOUT LIMITATION, WRITS OF ATTACHMENT, WRITS OF
POSSESSION, TEMPORARY RESTRAINING ORDERS OR PRELIMINARY
INJUNCTIONS). THIS REFERENCE PROVISION DOES NOT LIMIT THE RIGHT OF

11

oit_1120256_2
#1561186 v2 den

Detroit_1121914_3

39

ANY PARTY TO EXERCISE OR OPPOSE ANY OF THE RIGHTS AND REMEDIES
DESCRIBED IN CLAUSES (I) AND (II) OR TO SEEK OR OPPOSE FROM A COURT
OF COMPETENT JURISDICTION ANY OF THE ITEMS DESCRIBED IN CLAUSES
(III) AND (IV). THE EXERCISE OF, OR OPPOSITION TO, ANY OF THOSE ITEMS
DOES NOT WAIVE THE RIGHT OF ANY PARTY TO A REFERENCE PURSUANT
TO THIS REFERENCE PROVISION AS PROVIDED HEREIN.

(d) THE REFEREE SHALL BE A RETIRED JUDGE OR JUSTICE SELECTED BY
MUTUAL WRITTEN AGREEMENT OF THE PARTIES. IF THE PARTIES DO NOT
AGREE WITHIN TEN (10) DAYS OF A WRITTEN REQUEST TO DO SO BY ANY
PARTY, THEN, UPON REQUEST OF ANY PARTY, THE REFEREE SHALL BE
SELECTED BY THE PRESIDING JUDGE OF THE COURT (OR HIS OR HER
REPRESENTATIVE). A REQUEST FOR APPOINTMENT OF A REFEREE MAY BE
HEARD ON AN EX PARTE OR EXPEDITED BASIS, AND THE PARTIES AGREE
THAT IRREPARABLE HARM WOULD RESULT IF EX PARTE RELIEF IS NOT
GRANTED.  PURSUANT TO CCP § 170.6, EACH PARTY SHALL HAVE ONE
PEREMPTORY CHALLENGE TO THE REFEREE SELECTED BY THE PRESIDING
JUDGE OF THE COURT (OR HIS OR HER REPRESENTATIVE).

(e) THE PARTIES AGREE THAT TIME IS OF THE ESSENCE IN CONDUCTING
THE REFERENCE PROCEEDINGS. ACCORDINGLY, THE REFEREE SHALL BE
REQUESTED, SUBJECT TO CHANGE IN THE TIME PERIODS SPECIFIED HEREIN
FOR GOOD CAUSE SHOWN, TO (I) SET THE MATTER FOR A STATUS AND
TRIAL-SETTING CONFERENCE WITHIN FIFTEEN (15) DAYS AFTER THE DATE
OF SELECTION OF THE REFEREE, (II) IF PRACTICABLE, TRY ALL ISSUES OF
LAW OR FACT WITHIN ONE HUNDRED TWENTY (120) DAYS AFTER THE DATE
OF THE CONFERENCE AND (III) REPORT A STATEMENT OF DECISION WITHIN
TWENTY (20) DAYS AFTER THE MATTER HAS BEEN SUBMITTED FOR
DECISION.

(f) THE REFEREE WILL HAVE POWER TO EXPAND OR LIMIT THE AMOUNT
AND DURATION OF DISCOVERY.  THE REFEREE MAY SET OR EXTEND
DISCOVERY DEADLINES OR CUTOFFS FOR GOOD CAUSE, INCLUDING A
PARTY'S FAILURE TO PROVIDE REQUESTED DISCOVERY FOR ANY REASON
WHATSOEVER. UNLESS OTHERWISE ORDERED BASED UPON GOOD CAUSE
SHOWN, NO PARTY SHALL BE ENTITLED TO "PRIORITY" IN CONDUCTING
DISCOVERY, DEPOSITIONS MAY BE TAKEN BY EITHER PARTY UPON SEVEN
(7) DAYS WRITTEN NOTICE, AND ALL OTHER DISCOVERY SHALL BE
RESPONDED TO WITHIN FIFTEEN (15) DAYS AFTER SERVICE. ALL DISPUTES
RELATING TO DISCOVERY WHICH CANNOT BE RESOLVED BY THE PARTIES
SHALL BE SUBMITTED TO THE REFEREE WHOSE DECISION SHALL BE FINAL
AND BINDING.

(g) EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE REFEREE SHALL
DETERMINE THE MANNER IN WHICH THE REFERENCE PROCEEDING IS
CONDUCTED INCLUDING THE TIME AND PLACE OF HEARINGS, THE ORDER

12

40

OF PRESENTATION OF EVIDENCE, AND ALL OTHER QUESTIONS THAT ARISE
WITH RESPECT TO THE COURSE OF THE REFERENCE PROCEEDING. ALL
PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT
FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT
THAT WHEN ANY PARTY SO REQUESTS, A COURT REPORTER WILL BE USED
AT ANY HEARING CONDUCTED BEFORE THE REFEREE, AND THE REFEREE
WILL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT. THE PARTY
MAKING SUCH A REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE
FOR AND PAY THE COURT REPORTER. SUBJECT TO THE REFEREE'S POWER
TO AWARD COSTS TO THE PREVAILING PARTY, THE PARTIES WILL
EQUALLY SHARE THE COST OF THE REFEREE AND THE COURT REPORTER
AT TRIAL.

(h) THE REFEREE SHALL BE REQUIRED TO DETERMINE ALL ISSUES IN
ACCORDANCE WITH EXISTING CASE LAW AND THE STATUTORY LAWS OF
THE STATE OF CALIFORNIA. THE RULES OF EVIDENCE APPLICABLE TO
PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA WILL BE APPLICABLE
TO THE REFERENCE PROCEEDING. THE REFEREE SHALL BE EMPOWERED TO
ENTER EQUITABLE AS WELL AS LEGAL RELIEF, ENTER EQUITABLE ORDERS
THAT WILL BE BINDING ON THE PARTIES AND RULE ON ANY MOTION
WHICH WOULD BE AUTHORIZED IN A COURT PROCEEDING, INCLUDING
WITHOUT LIMITATION MOTIONS FOR SUMMARY JUDGMENT OR SUMMARY
ADJUDICATION. THE REFEREE SHALL ISSUE A DECISION AT THE CLOSE OF
THE REFERENCE PROCEEDING WHICH DISPOSES OF ALL CLAIMS OF THE
PARTIES THAT ARE THE SUBJECT OF THE REFERENCE. PURSUANT TO CCP §
644, SUCH DECISION SHALL BE ENTERED BY THE COURT AS A JUDGMENT
OR AN ORDER IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED
BY THE COURT AND ANY SUCH DECISION WILL BE FINAL, BINDING AND
CONCLUSIVE. THE PARTIES RESERVE THE RIGHT TO APPEAL FROM THE
FINAL JUDGMENT OR ORDER OR FROM ANY APPEALABLE DECISION OR
ORDER ENTERED BY THE REFEREE. THE PARTIES RESERVE THE RIGHT TO
FINDINGS OF FACT, CONCLUSIONS OF LAWS, A WRITTEN STATEMENT OF
DECISION, AND THE RIGHT TO MOVE FOR A NEW TRIAL OR A DIFFERENT
JUDGMENT, WHICH NEW TRIAL, IF GRANTED, IS ALSO TO BE A REFERENCE
PROCEEDING UNDER THIS PROVISION.

(i) IF THE ENABLING LEGISLATION WHICH PROVIDES FOR APPOINTMENT OF
A REFEREE IS REPEALED (AND NO SUCCESSOR STATUTE IS ENACTED), ANY
DISPUTE BETWEEN THE PARTIES THAT WOULD OTHERWISE BE
DETERMINED BY REFERENCE PROCEDURE WILL BE RESOLVED AND
DETERMINED BY ARBITRATION. THE ARBITRATION WILL BE CONDUCTED
BY A RETIRED JUDGE OR JUSTICE, IN ACCORDANCE WITH THE CALIFORNIA
ARBITRATION ACT §1280 THROUGH §1294.2 OF THE CCP AS AMENDED FROM
TIME TO TIME. THE LIMITATIONS WITH RESPECT TO DISCOVERY SET FORTH
ABOVE SHALL APPLY TO ANY SUCH ARBITRATION PROCEEDING.

oit_1120256_2¦
#1561186 v2 den

Detroit_1121914_3

(j) THE PARTIES RECOGNIZE AND AGREE THAT ALL CONTROVERSIES, DISPUTES AND CLAIMS RESOLVED UNDER THIS REFERENCE PROVISION WILL BE DECIDED BY A REFEREE AND NOT BY A JURY. AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER OWN CHOICE, EACH PARTY KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, AGREES THAT THIS REFERENCE PROVISION WILL APPLY TO ANY CONTROVERSY, DISPUTE OR CLAIM BETWEEN OR AMONG THEM ARISING OUT OF OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

23.     **Notice.**  All notices, demands and other communications required or permitted to be given hereunder shall be in writing or by written telecommunication, and shall be deemed to have been duly given if delivered personally, if mailed by certified mail return receipt requested, if delivered by overnight courier, if mailed, postage prepaid, or if sent by facsimile or other written telecommunication, confirmation of receipt received, as follows:

If to Secured Party, to:

> Comerica Bank
> One Detroit Center, 4th Floor
> Detroit, MI  48226
> Attn: Jacob Villemure
> Fax: (313) 222-5706

With a copy to:

> Bodman PLC
> Attn: Robert J. Diehl, Jr.
> 1901 St. Antoine Street
> 6th Floor at Ford Field
> Detroit, MI  48226
> Telephone: 313-393-7579
> Fax: 313-393-7579

If to Buyer, to:

> Commodity Trucking Acquisition, LLC
> 11150 Santa Monica Blvd.
> Suite 825
> Los Angeles, California 90025
> Attn: Jonathan Victor and Robin Nourmand
> Fax: 310-479-1740

oit_1120256_2|
#1561186 v2 den

Detroit_1121914_3

With a copy to:

> Holme Roberts & Owen LLP
> 800 West Olympic Boulevard, Fourth Floor
> Los Angeles, California 90015
> Attn: Carol Osborne
> Fax: 213-572-4400

24. **Further Assurances.** From time to time, at the reasonable request of Secured Party or Buyer, each party hereto shall execute and deliver such further instruments and take such further actions at the expense of the requesting party, as such requesting party may in good faith deem necessary or desirable in order to assure that the transfers, purposes and objectives of this Agreement are fully accomplished.

25. **Expenses.** Except as otherwise agreed herein, all expenses of the preparation, execution and consummation of this Agreement and the foreclosure sale transaction contemplated hereby, including, without limitation, attorneys', accountants' and outside advisor's fees and disbursements, shall be borne by the party incurring such expense; provided, however, that nothing contained herein shall in any manner alter, limit, or modify any of Secured Party's right to have such fees and expenses reimbursed pursuant to the provisions of the Credit Agreement and other applicable Loan Documents.

[Signatures on Following Page]

15

oit_1120256_2
#1561186 v2 den

Detroit_1121914_3

The parties have executed and delivered this Agreement as of the day and year first above written.

Secured Party:

**Comerica Bank, as Agent and Lender**

By: _____

Name: *E. Lee Jones*

Its: *Vice President*

**Buyer:**

**Commodity Trucking Acquisition, LLC**

By: _____

Name: _____

Its: _____

16

The parties have executed and delivered this Agreement as of the day and year first above written.

Secured Party:

**Comerica Bank, as Agent and Lender**

By:_____
Name: _____
Its:    _____

Buyer:

**Commodity Trucking Acquisition, LLC**

By: _Jonathan A. Victor_
Name: _Jonathan A. Victor_
Its:   _President_

16

oit_1120256_2
#1561186 v2 den

Detroit_1121914_3

45

# EXHIBIT "3"

1  **SUPERIOR COURT OF CALIFORNIA**
   **COUNTY OF SAN BERNARDINO**
2  Civil Division, Department S-37
   247 West Third Street
3  San Bernardino, California 92415-0210

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

**MAR 2 0 2015**

BY _Luann Geesink_
DEPUTY

8              **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                 **IN AND FOR THE COUNTY OF SAN BERNARDINO**

10                        **SAN BERNARDINO DISTRICT**

12  BRUTOCO ENGINEERING &
    CONSTRUCTION, INC., a California        Case No.  CIVDS1307312
13  corporation; BRENT, LLC,  a limited
14  liability company,
                                            **STATEMENT OF DECISION**
15            Plaintiffs,

16        v.

17  COMMODITY TRUCKING HOLDINGS,
18  LLC, et al,

19            Defendants.
    _____

20       In prior litigation, Brutoco Engineering & Construction, Inc. ("Brutoco") obtained a
21  judgment against Dispatch Transportation, LLC ("Dispatch") in the amount of
22  $65,848.25.[1]  The judgment is unpaid.  In the current litigation, Brutoco seeks to hold
23  *other* entities, the defendants in this case, liable for the judgment against Dispatch
24  under the doctrines of *alter ego* liability and successor liability.  Brutoco has failed to
25  establish the application of either doctrine.  Accordingly, the court rules in favor of
26  defendants on both claims.

28  [1]     *See* Exhibit 15, Judgment in San Bernardino County Superior Court Case No. 1106197, entered
    *nunc pro tunc* as of January 23, 2012.

1

1    Brutoco was not Dispatch's only creditor.  As of September 2011, Dispatch had

2    incurred approximately $55 million in debt, most of it owed to Dispatch's lender,

3    Comerica Bank.  To secure this debt, Comerica held a priority security interest in all

4    Dispatch's assets under Article 9 of the Uniform Commercial Code.  Dispatch's

5    encumbered assets were therefore unavailable for attachment by other creditors such

6    as Brutoco.

7    Effective September 14, 2011, Comerica foreclosed on Dispatch's assets and

8    sold them to a new company in exchange for twelve million dollars.   The new company

9    looks very similar to the old one.   From the perspective of an outsider, business

10   continued seamlessly without change or interruption.  The "new" business operates

11   from the same location as the old.  It employs the same workers.  It uses the same

12   equipment.  It operates under the same trade name, Dispatch Transportation, as well as

13   other trade names Dispatch had used.  The new company sells to the same customers.

14   It purchases from the same vendors.  And it operates under the direction of the same

15   day-to-day management team.  It is unlikely customers or vendors would realize there

16   has been a change of ownership.

17   Brutoco argues that the new company—defendant Commodity Trucking

18   Acquisition, LLC ("CTA")—is a legal fiction, an illusory transmogrification of the old

19   company.   While there was an infusion of new capital by new investors—the twelve

20   million dollars paid to Comerica for the assets—and a new legal structure for the

21   business,[2] Brutoco argues that nothing of substance changed.

22   This argument ignores a key fact.  *Dispatch did not transfer its assets to CTA.*

23   Comerica foreclosed on the assets—thereby becoming the owner—and CTA bought

24   those assets *from Comerica.*  There is no allegation or evidence that Comerica is an

25

26   [2]    CTA is wholly owned by defendant Commodity Trucking Holdings, LLC ("CTH").  The new
      investors own 80% of CTH.  The remaining 20% is owned by the individual operators of the business
27   (through various entities) who are also officers and directors.  This 80/20 ownership division in CTA is the
      flip side of the ownership division in Dispatch.  For Dispatch, the individual operators of the business
28   owned 80% while a different investment group, Bluepoint Capital, held a 20% interest.  Testimony of Kim
      Pugmire and Andrew Carey.  Exhibits 110,
      116, A.

2

1  *alter ego* of Dispatch.  The *real* issue is whether the foreclosure was proper under

2  Article 9 of the Uniform Commercial Code (UCC).  If it was, the legal effect of such a

3  foreclosure extinguishes claims against the assets by unsecured creditors and creditors

4  with junior security interests.  The argument that CTA and Dispatch should be

5  considered the same entity for all purposes, through the doctrines of *alter ego* or

6  successor liability, ignores the application of the UCC and how CTA acquired those

7  assets.

8      In short, the evidence reveals no defect in the foreclosure.  While Brutoco's claim

9  against Dispatch is not extinguished by the foreclosure, the liability remains with

10  Dispatch and was not transferred to CTA.  The court recognizes that, in all likelihood,

11  the judgment against Dispatch will remain uncollectible, just as the unpaid balance of

12  Dispatch's debt to Comerica will remain uncollectible.  Despite the superficial

13  appearance that the two companies are the same, there is no *alter ego* or successor

14  liability.

15                      The Article 9 Foreclosure

16      The foreclosure was conducted pursuant to the "Article 9 Purchase Agreement"

17  executed by CTA as "Buyer," by Comerica as the "Secured Party," and by Dispatch as

18  the "Borrower," effective September 14, 2011.[3]  The parties agreed the sale would fall

19  under Michigan's UCC law and constituted a private foreclosure sale as set forth in

20  Sections 9-610 *et seq.*[4]  The Agreement indicated in its Recitals that Comerica had

21  loaned or advanced money to Dispatch under various notes and other documents,

22  referred to collectively as the "Loan Documents" and that Dispatch had defaulted on

23  these Loan Documents.

---

[3]      *See* Exhibit 113.

[4]      The Michigan UCC mirrors the California UCC in all relevant respects.  The parties have cited to
California law, but as a practical matter it makes no difference because the statutes are virtually identical.
For the convenience of the parties, the court's citations are to the California statute.

3

1    CTA agreed to pay $12 million to Comerica for all Comerica's right, title, and

2 interest in and to the assets located at Dispatch's locations in the exhibits attached to

3 the Agreement, including the aggregate personal property valued at $2,385,000.

4                              Disposition of Collateral after Default

5    After a default by the obligor [Dispatch], "a secured party [Comerica] may sell,

6 lease, license, or otherwise dispose of any or all of the collateral in its present condition

7 or following any commercially reasonable preparation or processing." (UCC § 96105.)

8 "Every aspect of a disposition of collateral, including the method, manner, time, place,

9 and other terms, must be commercially reasonable." (*Id.*) As defined by statute, a

10 disposition of collateral is made in a commercially reasonable manner if it satisfies any

11 of these conditions: "(1) [i]t is made in the usual manner on any recognized market;" "(2)

12 [i]t is made at the price current in any recognized market at the time of the disposition;"

13 or "(3) [i]t is made otherwise in conformity with reasonable commercial practices among

14 dealers in the type of property that was the subject of the disposition." (UCC § 9627,

15 subd. (b).)[6]

16

17 _____

[5]    Michigan's UCC statute, section 9610, provides:

18
      (1) After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the
19 collateral in its present condition or following any commercially reasonable preparation or processing.
      (2) Every aspect of a disposition of collateral, including the method, manner, time, place, and
20 other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose
   of collateral by public or private proceedings, by 1 or more contracts, as a unit or in parcels, and at any
21 time and place and on any terms.
      (3) A secured party may purchase collateral either at a public disposition, or at a private
22 disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject
   of widely distributed standard price quotations.
23      (4) A contract for sale, lease, license, or other disposition includes the warranties relating to title,
   possession, quiet enjoyment, and the like which by operation of law accompany a voluntary disposition of
24 property of the kind subject to the contract.
      (5) A secured party may disclaim or modify warranties under subsection (4) either in a manner
25 that would be effective to disclaim or modify the warranties in a voluntary disposition of property of the
   kind subject to the contract of disposition, or by communicating to the purchaser a record evidencing the
26 contract for disposition and including an express disclaimer or modification of the warranties.
      (6) A record is sufficient to disclaim warranties under subsection (5) if it indicates "There is no
27 warranty relating to title, possession, quiet enjoyment, or the like in this disposition" or uses words of
   similar import.

28
   [6]    Michigan's UCC statute, section 9627, provides:

                                         4

1    "However, the methods of commercially reasonable dispositions listed under

2    § 9627(b) are not required or exclusive, and other types of dispositions may" satisfy the

3    standard. (*Bank of the Sierra v. Kallis,* No. CIV F 05–1574 AWI SMS, 2006 WL

4    3513568, 2006 U.S. Dist. LEXIS 88234, at *26 (E.D.Cal. Dec. 6, 2006).) "The fact that

5    a greater amount could have been obtained by a collection, enforcement, disposition, or

6    acceptance at a different time or in a different method from that selected by the secured

7    party is not of itself sufficient to preclude the secured party, from establishing

8    [commercial reasonableness]." (UCC § 9627, subd. (a).) Ultimately, "[w]hether a

9    disposition is commercially reasonable is generally a question of fact and depends on

10    all of the circumstances existing at the time of the sale." (*Bank of the Sierra,* 2006 U.S.

11    Dist. LEXIS 88234, at *26 [citing *Ford & Vlahos v. ITT Commercial Fin. Corp.* (1994) 8

12    Cal.4th 1220; *Aspen Enters., Inc. v. Bodge* (1995) 37 Cal.App.4th 1811, 1827; *Crocker*

13    *Nat'l Bank v. Emerald,* (1990) 221 Cal.App.3d 852].)

14        The evidence presented at trial revealed that Comerica was a secured creditor

15    with a priority position as to all Dispatch's interest in trucks, trailers, other vehicles,

16    fixtures, equipment, trademarks (including trade names, corporate names, company

17    names, business names, trade styles, service marks, logos, and other source or

18    business identifiers, and all customer relationships and goodwill associated therewith,

19    including fictitious business names), real property leases, intellectual property, other

20

21

---

22        (1) The fact that a greater amount could have been obtained by a collection, enforcement,
disposition, or acceptance at a different time or in a different method from that selected by the secured
23    party is not of itself sufficient to preclude the secured party from establishing that the collection,
enforcement, disposition, or acceptance was made in a commercially reasonable manner.
24        (2) **A disposition of collateral is made in a commercially reasonable manner if the
disposition is made in the usual manner on any recognized market, at the price current in any
25    recognized market at the time of the disposition, or otherwise in conformity with reasonable
commercial practices among dealers in the type of property that was the subject of the
26    disposition.** [Bold added.]
        (3) A collection, enforcement, disposition, or acceptance is commercially reasonable if it has been
27    approved in a judicial proceeding, by a bona fide creditors' committee, by a representative of creditors, or
by an assignee for the benefit of creditors.
28        (4) Approval under subsection (3) need not be obtained, and lack of approval does not mean that
the collection, enforcement, disposition, or acceptance is not commercially reasonable.

1   leases and contracts, receivables, securities, claims, and cash and deposit accounts,

2   among other property.[7]

3        When Comerica declared a default, it required Dispatch to engage the firm of

4   Conway McKenzie, with Steve Wybo as Chief Restructuring Officer, to work on a Wind-

5   Down/Liquidation Report and to find a buyer for the assets. Mr. Wybo solicited bid

6   proposals to purchase the assets of Dispatch and received five responses, including an

7   offer from Balmoral Advisors, LLC (Balmoral), which Comerica preferred.[8]

8        At the close of the bidding process, between April and September 2011,

9   Balmoral and Comerica entered into negotiations for the private foreclosure of the

10  purchased assets. In anticipation of the purchase via the private foreclosure, CTH and

11  CTA were formed and fictitious business name statements were recorded in July 2011.

12       Brutoco's claim that CTA's payment of $12 million resulted in "no consideration

13  whatsoever" to Dispatch reveals a misunderstanding of the process. The $12 million

14  payment reduced Dispatch's debt to Comerica by that amount and thus constituted

15  consideration for the assets. Further, there was no evidence the payment was

16  insufficient, especially in view of the recital that the personal property assets were

17  valued at less than $3 million. Given Dispatch's debt to asset ratio, Brutuco would have

18  received nothing had Dispatch filed for bankruptcy and liquidated. There was evidence

19  of fraud behind this transaction.

20       The private foreclosure sale was conducted, effective September 14, 2011,

21  pursuant to the terms of the Agreement by which Comerica sold the assets it had

22  acquired from Dispatch through the foreclosure to CTA for $12 million. The aggregate

23  value of the tangible personal property purchased, listed in Exhibit 113-"B," equaled

24  $2,385,000. In addition there were twelve premises listed on Exhibit 113-"A" where the

25  personal property was located. As of August 31, 2011, the total amount of Borrower's

26

27  ───────────────

    [7]    *See* Exhibits 26/113, Exh. B pp. 26-25-26-32.

28  [8]    Testimony of Andrew Carey.

                            6

                            51

1  outstanding obligations on the Loan Documents was not less than $55 million.[9]

2  Consequently, the Agreement (¶7) provided that the balance of the $43 million debt

3  Dispatch owed to Comerica remained outstanding.  The buyer, CTA, did not assume

4  this liability and expressly disavowed "successor" liability.[10]

5      There was no evidence that Comerica failed to conduct the sale in a

6  commercially reasonable manner.  "A disposition of collateral is made in a commercially

7  reasonable manner if the disposition is made in the usual manner on any recognized

8  market, at the price current in any recognized market at the time of the disposition, or

9  otherwise in conformity with reasonable commercial practices among dealers in the type

10  of property that was the subject of the disposition."  (UCC § 9627.)

11      Neither side provided any evidence that the market for the collateral required a

12  different disposition.  Nor does Brutoco claim the price in any recognized market is

13  different.  Brutoco did not provide an expert and did not challenge the adequacy of the

14  consideration paid by Comerica for the assets.  Hence, the only reasonable conclusion

15  for the court to reach under the evidence is that the sale was made in a commercially

16  reasonable manner.

17      As noted by the defendants, the ability to sell assets without including the liability

18  is commonplace in the corporate world, and as long as it does not cause harm to tort

19  victims, or follow from fraud, this business practice will be permitted.  "Major economic

20  decisions, critical to society, are best made in a climate of relative certainty and

21  reasonable predictability.  The imposition of successor liability on a purchasing

22  company long after the transfer of assets defeats the legitimate expectations the parties

23  held during negotiation and sale.  Another consequence that must be faced is that few

24  opportunities would exist for the financially troubled company that wishes to cease

25  business but has had its assets devalued by the extension of successor liability."

26  (*Monarch Bay II v. Professional Serv. Indus., Inc.* (1999) 75 Cal.App.4th 1213, 1218.)

---

27

[9]    *See* Exhibit 113, ¶ 6(e).

28

[10]   *See* Exhibit 113-D.

*52*

1    Because the foreclosure sale was commercially reasonable, Comerica was able

2  to dispose of the collateral at any time and place and on any terms.  The terms of the

3  sale preclude Brutoco's claim.

4    Brutoco's arguments that the foreclosure sale should be treated as something

5  else rest upon theories of liability for tort victims which are not applicable here.  Brutoco

6  has failed to provide a single case discussing the UCC (from any state) and its

7  application to the types of transactions involved in this litigation.

8                Exculpatory Language in Article 9 Purchase Agreement

9    Brutoco takes issue with the exculpatory language in the Agreement and claims

10  that a party cannot insulate itself from liability by using exculpatory language in an

11  agreement prepared by that party.  However, there is no authority cited for this

12  proposition.  A point merely asserted without any authority for the proposition is deemed

13  without foundation and requires no discussion.  (See *Allen v. Smith* (2002) 94

14  Cal.App.4th 1270, 1281 [rejected on another point in *San Diego Watercrafts, Inc. v.*

15  *Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 315; see also *Harding v. Harding* (2002)

16  99 Cal.App.4th 626, 635.)

17    Brutoco goes on to state that *if* the elements of successor liability or *alter ego*

18  have been established, then nothing in the Agreement will exculpate CTA from liability,

19  citing Civil Code section 1714 and *Ferrell v. Southern Nevada Off-Road Enthusiasts,*

20  *Ltd.* (1983) 147 Cal.App.3d 309, 314-315.  These authorities have nothing to do with the

21  UCC.  Civil Code section 1714 is the negligence statute and the *Ferrell* case involved a

22  release of liability for a dune buggy race.  Neither situation involves the UCC or financial

23  liabilities disclaimed in the purchase agreement.

24                Successor Liability/Alter Ego/"Mere Continuation" Theory

25    Brutoco, after pointing to the facts showing the near seamless transition from

26  Dispatch to CTA, contends that CTA, as the transferee entity, nevertheless faces

27  liability under either successor liability or *alter ego*, irrespective of the manner in which

28  CTA acquired the business and assets.

53

1    Brutoco cites to *Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28, which provides that a

2  corporation purchasing the assets of another corporation does not assume the selling

3  corporation's liabilities "unless (1) there is an express or implied agreement of

4  assumption, (2) the transaction amounts to a consolidation or merger of the two

5  corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4)

6  the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability

7  for the seller's debts." (*Id.*)

8    Here, there was no evidence to support the first prong of *Ray*—an express or

9  implied agreement of assumption.  The testimony and documents show without

10  question that the principals of Dispatch and CTA intended precisely the opposite.

11    Similarly, there was no evidence to support the second prong—a consolidation or

12  merger.  The transactions were structured to avoid such a conclusion; indeed, CTA is

13  apparently a viable company and Dispatch is now an empty shell.

14    Brutoco focuses, of course, on the third prong—a purchasing company can be

15  shown to be a "mere continuation" of the seller.  "California decisions holding that a

16  corporation acquiring the assets of another corporation is the latter's mere continuation

17  and therefore liable for its debts have imposed such liability only upon a showing of one

18  or both of the following factual elements: 1) no adequate consideration was given for the

19  predecessor corporation's assets and made available for meeting the claims of its

20  unsecured creditors; (2) one or more persons were officers, directors, or stockholders of

21  both corporations. [Citations.]" (*Id.* at p. 29.)  But the imposition of successor liability on

22  this theory requires a "*direct sale of assets from the predecessor corporation to the*

23  *successor corporation.*" (*Maloney v. American Pharmaceutical Co.* (1988) 207

24  Cal.App.3d 282, 288, emphasis added.)  This did not occur.  As explained above,

25  Comerica acquired the assets through foreclosure and CTA bought the assets from

26  Comerica, not from Dispatch.  There was no contention that Comerica was in some

27  fashion the *alter ego* of Dispatch.

28

54

1    Similarly, the fourth prong of Ray—that the transfer of assets to the purchaser is

2  for the fraudulent purpose of escaping liability for the seller's debts—has not been

3  established by the evidence.  Nor do Brutoco's legal authorities establish a basis for

4  fraud.

5    Brutoco cites to *Blank v. Olcovich Shoe Corp.* (1937) 20 Cal.App.2d 456, and

6  three earlier cases to claim the lack of a direct transfer of assets does not defeat

7  successor liability when the new corporation is in reality a continuation of the old,

8  especially where creditors' rights are concerned.  However, *Blank* involved employee

9  purchases of company stock, later determined to be unlawful.  The business went into

10 bankruptcy and a new corporation was organized and bought the assets from the

11 trustee.  The new company offered stock shares to the plaintiffs in proportion to their

12 prior holdings, later changing its name to The Olcovich Shoe Corporation.  (*Id.* at pp.

13 457–460.)  In a later action, the new company was held liable for the acts of its

14 predecessor (selling stock in violation of law).  (*Id.* at pp. 460–461.)

15    Citing the evidence of similarity of names, identical directors, purchase of assets

16 and offer of stock to the old shareholders at a nominal value, the court held:

17 "[C]orporations cannot escape liability by a mere change of name or a shift of assets

18 when and where *it is shown that the new corporation is, in reality, but a continuation of*

19 *the old.*  This is especially well-settled when actual fraud or the rights of creditors are

20 involved, under which circumstances the courts uniformly hold the new corporation

21 liable for the debts of the former corporation. [Citations.]"  (*Id.* at p. 461, italics added.)

22    *Blank* is distinguishable from this case.  It does not support plaintiff's claim that

23 "successor liability is not defeated by an intervening foreclosure sale" because *Blank* did

24 not involve a UCC foreclosure sale.  Moreover, the trustee's role is distinguishable from

25 that of foreclosing-lender Comerica.  The trustee in *Blank* dealt with the existing assets

26 of the bankrupt old company and found a buyer which in turn set up a new company in

27 essentially the same manner as the old.  The trustee was merely a court-appointed

28 intermediary to facilitate the resolution of the bankruptcy with no financial stake in the

1   outcome. In contrast, Comerica had a *substantial* stake ($55 million) interest in

2   Dispatch. *Blank* is inapplicable here, and it also predates the adoption of the UCC.

3       Brutoco cites three more cases from 1916, 1919, and 1936. All three cases are

4   distinguishable: *Stanford Hotel Co. v. M. Schwind Co.* (1919) 180 Cal. 348 [corporation

5   intentionally became insolvent and failed to pay taxes to avoid lease, restructuring

6   immediately to continue restaurant business]; *Strahm v. Fraser* (1916) 32 Cal.App. 447

7   [new corporation formed after termination of plaintiff's employment could not avoid old

8   corporation's liability for payment of past due salary]; and *Malone v. Red Top Cab Co.*

9   (1936) 16 Cal.App.2d 268 [months after fatal accident, resolution of new company to

10   acquire all assets of old taxicab company, leaving no cash to satisfy claim, was properly

11   submitted to jury on issue of successor liability]. Again, none involved the UCC.

12       The involvement of Comerica—unquestionably an independent and unrelated

13   company with a substantial financial interest of its own—distinguishes the current case

14   from the authorities cited by Brutoco with respect to successor liability and "mere

15   continuation." Comerica was a *lender* which provided $55 million in financing, secured

16   by Dispatch's assets. Comerica collected only $12 million of this debt and the

17   remaining $43 million remains essentially uncollectable.[11]

18       The decision *by Comerica* to foreclose upon Dispatch's assets following the

19   default was in compliance with the UCC and the commercially reasonable sale

20   withstands judicial review. There is no successor liability or alter ego in a UCC

21   foreclosure. The sale complied with the UCC which is the relevant law for the court to

22   follow.

23       Accordingly, the court rules in favor of defendant on all claims.

24       Counsel for defendants is ordered to prepare a proposed judgment, to be

25   reviewed by counsel for plaintiff, and submitted to the court for consideration of any

26   objections. If the proposed judgment is not submitted, or if it remains unsigned by the

27

28

---

[11]      In essence, Brutoco claims that Comerica agreed to sell the assets and accept over $40 million in losses in order to avoid paying Brutoco's $65,000 claim and the $5-7 million of other creditors.

1   court, counsel are ordered to appear in Department S-37 on May 4, 2015, at 8:30 am. If

2   the court has signed a judgment before that date, no appearance is required.

3

4   Dated March, _____20_____, 2015

5

6                                David Cohn,

7                                Judge of the Superior Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

57

# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN BERNARDINO

### SAN BERNARDINO DISTRICT, CIVIL DIVISION

| | |
|---|---|
| TITLE OF CASE (ABBREVIATED): | In the Matter of |
| | **Brutoco Engineering & Construction, Inc., vs Commodity Trucking Holdings, LLC** |
| CASE NUMBER: | CIVDS 1307312 |

## DECLARATION OF SERVICE BY MAIL

My business address is:  San Bernardino Superior Court, 303 West Third Street, San Bernardino, California 92415.

I hereby declare that I am a citizen of the United States, over the age of 18, employed in the above-named county, and not a party to nor interested in this proceeding. On _____ March 20, 2015 _____, I deposited in the United States mail at San Bernardino, California, a sealed envelope (postage prepaid) which contained a true copy of the attached:

NAME OF DOCUMENT:              **STATEMENT OF DECISION**

which was addressed as follows:

**Name and Address of Persons Served:**

| | |
|---|---|
| RICHARD A. SOLL, ESQ. | J. Craig Johnson |
| MAHONEY & SOLL, ESQ. LLP | JOHNSON LAW FIRM APC |
| 150 West First Street, Suite 280 | 14596 Winchester Road, Suite 200 |
| P. O. Box 940 | P.O. Box 891209 |
| Claremont, CA  91711 | Temecula, CA 92589 |

At the time of mailing this notice there was regular communication between the place of mailing and the place(s) to which this notice was addressed.

I declare under penalty of perjury the foregoing to be true and correct.

DATED: ____ March 20, 2015 ____          by _~Michele D. Stallone~_

Michele Stallone
Administrative Assistant II